*Comptroller of Maryland v. The Potomac Edison Company,* No. 12, September Term, 2025. Opinion by Gould, J.

**TAX-GENERAL ARTICLE – TAX EXEMPTION – "TANGIBLE PERSONAL PROPERTY" USED "DIRECTLY AND PREDOMINANTLY" IN A "PRODUCTION ACTIVITY"**

The Supreme Court of Maryland determined that the equipment that comprises a public utility company's transmission and distribution system subjects the electricity to a series of actions designed for the specific objective of delivering, over long distances, electricity generated out of State to Maryland customers at a voltage suitable for use. Such equipment is, therefore, used for "processing" and, as such, performs a "production activity" under subsection 11-210(b)(1) of the Tax-General Article.

**TAX-GENERAL ARTICLE – TAX EXEMPTION – "TANGIBLE PERSONAL PROPERTY" USED "DIRECTLY AND PREDOMINANTLY" IN A "PRODUCTION ACTIVITY"**

The Supreme Court of Maryland agreed with the Maryland Tax Court that the conductor, substation, and transformer equipment used by a public utility company in the transmission and distribution of electricity was used "directly and predominantly" in "processing" electricity and therefore qualified for an exemption from the sales and use tax. The Supreme Court also agreed with the Tax Court that foundation support structures, such as the clamps, bolts, brackets, and other items, served only to physically support other components and thus did not qualify for the exemption.

**TAX-GENERAL ARTICLE – LIMITATION OF ACTIONS – REQUEST FOR REFUND OF SALES AND USE TAX PAID**

The Supreme Court of Maryland found that the four-year limitations period, as provided in subsection 13-1104(g) of the Tax-General Article, is the general limitations period for sales and use tax refund claims. The 30-day limitations period provided in subsection 13-508(a) is a narrow exception for the specific situation in which a taxpayer pays an assessed tax, in response to a notice of assessment, and seeks a refund of that payment within the 30-day window.

**TAX-GENERAL ARTICLE – RECOVERABLE INTEREST ON AN OVERPAYMENT**

The Supreme Court of Maryland analyzed subsection 13-603(a) of the Tax-General Article, which requires the Comptroller to pay interest on an approved refund. Subsection 13-603(b)(2)(i) makes an exception for a refund "based on . . . an error or mistake of the claimant not attributable to the State." That exception applies only if both conditions are

met: the overpayment must be the taxpayer's mistake, *and* it must not be attributable to the State. The Supreme Court found that a public utility company that, due to an error, paid sales and use tax on only certain equipment that it contended was exempt from sales and use tax, was nonetheless able to recover interest on those tax payments made, because the State had wrongly determined that the equipment was taxable.

Circuit Court for Anne Arundel County
Case No.: C-02-CV-22-000534
Argued: October 1, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 12

September Term, 2025

_____

COMPTROLLER OF MARYLAND

v.

THE POTOMAC EDISON COMPANY

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Gould, J.
Killough, J., dissents.

_____

Filed: July 17, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case requires us to address three issues concerning the Maryland sales and use tax statute. The first is the exemption in subsection 11-210(b)(1) of the Tax-General Article of the Maryland Annotated Code, MD. CODE ANN., TAX-GEN. ("TG") § 11-210(b)(1) (2026 Repl. Vol.), which exempts from the tax "tangible personal property" used "directly and predominantly in a production activity[.]" "Production activity" includes the "processing" of "tangible personal property for resale." *Id.* § 11-101(f)(1)(i). The Comptroller of Maryland (the "Comptroller") and The Potomac Edison Company ("Potomac Edison") dispute whether the equipment used by the latter to transmit and distribute electricity to its Maryland customers is used in a "production activity" and, if so, whether such equipment is used "directly and predominantly" for that purpose.

The second issue is the limitations period applicable to refund claims for the sales and use tax. Subsection 13-1104(g) of the Tax-General Article sets a four-year limitations period for those claims; subsection 13-508(a) sets a 30-day limitations period for a narrow subset of claims arising from an assessment by the Comptroller. The parties disagree over which provision applies here.

The third issue concerns TG § 13-603, which requires the Comptroller to pay interest on a refund unless the taxpayer's mistake in making the payment was not attributable to the State. The parties dispute whether that exception applies here.

We hold that: (1) certain equipment purchased by Potomac Edison during the relevant time period was used to "process" electricity within the meaning of the "production activity" exemption and that the Tax Court's finding that such equipment was used "directly and predominantly" for that purpose was supported by substantial evidence;

(2) subsection 13-1104(g)'s four-year limitations period—not § 13-508(a)'s 30-day limitations period—governs the timeliness of Potomac Edison's refund claim; and (3) Potomac Edison is entitled to interest on its refund under § 13-603. Having decided that the four-year limitations period applies to Potomac Edison's refund claim, we decline to address Potomac Edison's contentions, raised but not decided in the Appellate Court, that it reached a valid, mutual agreement with the Comptroller to extend their respective limitations periods and that the Comptroller is equitably estopped from asserting otherwise.

We therefore affirm in part, reverse in part, and remand to the Appellate Court of Maryland for further proceedings.

I

A

A sales and use tax is imposed on any "retail sale" or "use" of "tangible personal property" in Maryland. TG § 11-102(a). Although some transactions are exempt, the statute presumes that the sales and use tax applies. *Id.* § 11-103(a). A person seeking to avoid payment of the tax "has the burden of proving that a sale in the State is not subject" to it. *Id.* § 11-103(b).

The exemption at issue here—known as the "production activity" exemption—is set forth in TG § 11-210(b):

> The sales and use tax does not apply to a sale of:
> (1) tangible personal property . . . used directly and predominantly in a production activity at any stage of operation on the production activity site from the handling of raw material or components to the movement of the finished product, if the tangible personal property . . . is not installed so that it becomes real property[.]

2

"Production activity" is defined under TG § 11-101(f)(1), in relevant part, as:

> (i)    except for processing food or a beverage by a retail food vendor, assembling, manufacturing, processing, or refining tangible personal property for resale; [or]
>
> (ii)   generating electricity for sale or for use in another production activity[.]

"Tangible personal property," in turn, is defined to include, among other things, "coal, electricity, oil, nuclear fuel assemblies, steam, and artificial or natural gas." *Id.* § 11-101(k)(2)(iii).

B

Potomac Edison is a public utility company that sells electricity to Maryland customers. The electricity is generated outside the State and delivered to Potomac Edison's customers through a transmission and distribution system consisting of conductors, substations, transformers, and related equipment. Electricity is generated at a power plant, where raw material is transformed into electric power through a process known as energy conversion. A coal generator, for example, burns coal and releases energy as heat, which converts water into steam that turns a turbine, resulting in the production of electric power. Electric power is transmitted from the generator to customers through a system of wire conductors.

Electric power is comprised of voltage and current: voltage is the pressure or force behind the electrons, and current is the rate at which charge-carrying electrons flow through a conductor. Electric power is measured in watts, voltage is measured in volts, and current is measured in amperes. The electricity generated at a power plant is around 18,000 volts, which is too low to be transmitted efficiently over long distances and too high for retail

3

customers to use. Thus, the voltage of the electricity must be "stepped up" for transmission and later "stepped down" for distribution to customers.

The voltage is "stepped up" before it leaves the power plant. Transmitting electricity results in energy loss, known as "line loss"—caused by the generation of heat produced by the movement of electrons along the conductor. To avoid line loss, and thereby preserve the electricity for distribution, Potomac Edison uses "transformers" to raise the voltage of the electricity from 18,000 volts to as high as 500,000 or 765,000 volts. At that point, the high-voltage electricity leaves the power plant and travels along transmission lines to substations containing transformers, switches, controllers, capacitors, and other equipment.

At the substations, the voltage is "stepped down" in preparation for regional distribution. "Stepping down" the voltage increases line loss, but it brings the voltage closer to a level usable by Potomac Edison's customers. The voltage at this stage may be reduced from 500,000 volts to 230,000 volts, then further to 138,000 volts, then to 34,500 volts, and ultimately reduced to lines operating at 12,500 volts. Potomac Edison's customers have distinct voltage needs that vary with the intended use of the electricity, but, in any case, they require electricity at voltages far lower than the transmission voltage.

The electricity then enters the distribution system, where it travels along smaller conductors to last-in-line transformers, typically large metal cylinders mounted on utility poles, near the customer's premises. At this point, the transformers further reduce the voltage to a level suitable for the customer's precise needs: 120 or 240 volts in residential settings, and somewhat higher voltages, such as 480 volts, in commercial and industrial settings. Only at that point is the electricity in a form that can be consumed by the end user.

## C

In 2006, Potomac Edison concluded that most of the equipment it had purchased for its transmission and distribution system qualified for the "production activity" exemption, and so informed the Comptroller. In response, the Comptroller initiated an audit to determine Potomac Edison's liability for sales and use tax for the period of August 1, 2003, through July 31, 2007. Notwithstanding its position, due to an accounting irregularity, Potomac Edison paid sales and use tax on some, but not all, of the equipment purchased for its transmission and distribution system. For easy reference, we will refer to these payments as the "Audit Period Payments."

On April 1, 2011, with the audit nearing completion, Potomac Edison filed a request for a refund of the Audit Period Payments (the "Refund Request"). One week later, the Comptroller completed the audit and issued a notice of assessment for sales and use taxes in the amount of $1,757,862.18, representing the taxes Potomac Edison did *not* pay during the audit period, plus interest of $1,309,958.90, and a penalty of $175,786.22. Potomac Edison timely petitioned for a redetermination of the assessment (the "Redetermination Request") and, without waiving its rights, paid the assessment but not the interest or penalty. Thus, Potomac Edison had two separate claims pending with the Comptroller: (1) the Refund Request, seeking a refund of the Audit Period Payments; and (2) the Redetermination Request, challenging the entire audit assessment. As to both claims, Potomac Edison relied on the "production activity" exemption, claiming that the equipment at issue was used, in the words of the statute, "directly and predominantly in a production activity[.]"

5

The Comptroller denied both the Refund Request and the Redetermination Request, concluding that the "production activity" exemption did not apply. Potomac Edison appealed the Comptroller's final determinations to the Tax Court, which affirmed. Potomac Edison petitioned for judicial review in the Circuit Court for Baltimore City, which affirmed the Tax Court.

D

Potomac Edison then took its first trip to the Appellate Court of Maryland. In an unreported opinion, the Appellate Court reversed, holding that at least some of the equipment should qualify under the "production activity" exemption of TG § 11-210(b)(1). *Potomac Edison Co. v. Comptroller of Treasury*, No. 1645, Sept. Term 2016, 2019 WL 1897463, at *1, *9 (Md. Ct. Spec. App. Apr. 29, 2019) ("*Potomac Edison I*"). The Appellate Court observed that the statute defines "production activity" to include, among other things, "processing, or refining tangible personal property for resale" and that "tangible personal property" is defined to include "electricity" under TG § 11-101(k)(2)(iii). *Id*. at *8. The court also determined that "some degree of processing was required between the point at which Potomac Edison received the electricity from the generating plant and the point of delivery to" its Maryland customers. *Id*. at *9. Thus, the Appellate Court remanded the matter for the Tax Court to determine which equipment would qualify for the exemption under its statutory analysis. *Id*. at *9-10.

E

On remand, applying the Appellate Court's interpretation of the "production activity" exemption, the Tax Court found that Potomac Edison's conductor, substation, and

6

transformer equipment was used "directly and predominantly" in "processing" electricity and therefore qualified for the exemption. But the Tax Court determined that certain other equipment categorized as "distribution" equipment and foundation support structures, such as clamps, bolts, and brackets, did *not* qualify for the exemption. Thus, the Tax Court granted in part and denied in part Potomac Edison's Refund Request and Redetermination Request.

The Tax Court also rejected the Comptroller's argument, raised for the first time on remand, that the bulk of Potomac Edison's refund claim was untimely under TG § 13-1104(g)'s four-year limitations period. The Tax Court held that the Comptroller was estopped from asserting a limitations defense based on representations made on the Comptroller's behalf to Potomac Edison that the extension agreements both parties had signed—which ostensibly extended only the Comptroller's deadlines—likewise extended the limitations period for Potomac Edison to request a refund. Thus, the Tax Court concluded that Potomac Edison's Refund Request was timely, and that Potomac Edison was owed interest under TG § 13-603 for the tax payments it made on the exempt equipment.

F

The Comptroller petitioned for judicial review in the Circuit Court for Anne Arundel County. The circuit court affirmed the Tax Court's ruling on the applicability of the "production activity" exemption but reversed the Tax Court on its statute of limitations decision. The circuit court held that the Comptroller was not estopped from asserting a limitations defense and that the four-year limitation period under TG § 13-1104(g) applied

7

to the Refund Request, which meant that the Refund Request was timely only as to Audit Period Payments made between April 1, 2007, and July 31, 2007. The circuit court held that the rest of Potomac Edison's Refund Request was time-barred.

G

Then it was back to the Appellate Court on Potomac Edison's appeal and the Comptroller's cross-appeal. Potomac Edison argued that the circuit court erred in its statute of limitations decision for two reasons: (1) Potomac Edison and the Comptroller contractually agreed to a mutual extension of the parties' respective limitations periods; and (2) the Comptroller was equitably estopped from relying on TG § 13-1104(g)'s four-year statute of limitations.

The Comptroller argued that: (1) the Tax Court erred in determining that the "production activity" exemption applied; (2) the Tax Court's finding that certain equipment was used "directly and predominantly in a production activity" was not supported by substantial evidence; and (3) Potomac Edison was not entitled to interest on its Refund Request because the Audit Period Payments were due to an accounting irregularity and thus were not attributable to the State.

The Appellate Court affirmed the Tax Court's determination that certain equipment qualified for the "production activity" exemption and that Potomac Edison was entitled to interest on its refund. *In re the Comptroller of Maryland*, 264 Md. App. 23, 53-54 (2024) ("*Potomac Edison II*"). In doing so, the Appellate Court applied the law of the case doctrine and declined to revisit its determination, made in *Potomac Edison I*, that TG § 11-210(b)

8

exempted at least some of the equipment purchased by Potomac Edison for its transmission and distribution system. *Id*. at 48-49.

The Appellate Court also found no need to address Potomac Edison's statute of limitations arguments, because it instead held that Potomac Edison's Refund Request was governed by TG § 13-508(a)—not TG § 13-1104(g). *Id*. at 39-40. Because Potomac Edison filed its Refund Request within 30 days from the notice of assessment, the Appellate Court determined that the entire claim was timely under TG § 13-508(a). *Id*. at 41.

H

The Comptroller petitioned this Court for a writ of certiorari, which we granted. *Comptroller of Maryland v. The Potomac Edison Co.*, 490 Md. 279 (2025). The Comptroller presents us with four questions, which we consolidated and rephrased:

1. Did the Tax Court erroneously determine that Potomac Edison's conductor, substation, and transformer equipment was exempt under TG § 11-210(b)(1)?

2. Did the Appellate Court of Maryland err in holding that Potomac Edison's Refund Request was governed by the 30-day limitations period under TG § 13-508(a), instead of the four-year limitations period under TG § 13-1104(g)?

3. Did the Tax Court err in determining that Potomac Edison was entitled to interest on the successful portion of its Refund Request?

We answer "no" to the first and third questions and "yes" to the second question.

II

A

When reviewing the decision of an administrative agency, such as the Tax Court, *see* TG § 3-102, we generally look through the decisions of the circuit court and the intermediate appellate court and evaluate the agency's decision. *Comptroller of Maryland*

*v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 359 (2022) (citing *Gore Enter. Holdings, Inc. v. Comptroller of Treasury*, 437 Md. 492, 503 (2014)). We apply the "substantial evidence" standard to factual findings, asking whether the record contains evidence that reasonably supports the agency's conclusions. *Id*. at 359 (citing *Frey v. Comptroller of Treasury*, 422 Md. 111, 137 (2011)). In doing so, we review the evidentiary record in the light most favorable to the agency and defer to the agency's credibility determinations and resolution of conflicting evidence. *Id*. (quoting *Ramsey, Scarlett & Co., Inc. v. Comptroller of Treasury*, 302 Md. 825, 835 (1985)).

An agency's decisions are also reviewed for legal errors, of which there are at least four categories: "(1) the constitutionality of an agency's decision; (2) whether the agency had jurisdiction to consider the matter; (3) whether the agency correctly interpreted and applied applicable case law; (4) and whether the agency correctly interpreted an applicable statute or regulation." *Id*. at 360. We have often stated that we apply a de novo standard of review to an agency's legal determinations, and that is certainly true for the first three categories. *See id*. (quoting *Schwartz v. Md. Dep't of Nat. Res.*, 385 Md. 534, 554 (2005)).

We have, however, occasionally applied some agency deference to the fourth category, specifically when an agency interprets a statute that it administers or a regulation it promulgated under such a statute. *Id*. at 362 (citation omitted). Just how much deference we give depends on various considerations, which we have described as a "sliding-scale approach[.]" *Id*. at 363. "We give more weight when the interpretation resulted from a process of reasoned elaboration by the agency, when the agency has applied that interpretation consistently over time, or when the interpretation is the product of contested

adversarial proceedings or formal rule making." *Id.* at 363 (citation modified). It should be noted that in the context of interpreting tax laws, the agency to which deference may be owed is the Comptroller, not the Tax Court. *Id.* at 377. Here, the Comptroller did not contend, let alone demonstrate, that the conditions warranting agency deference are satisfied. Thus, we will not give deference to the legal reasoning the Comptroller applied in rejecting the Refund Request and Redetermination Request.

B

The threshold question here is whether Potomac Edison's conductor, substation, and transformer equipment is "used directly and predominantly in a production activity" under TG § 11-210(b)(1). That question has two parts. The first is one of statutory construction: whether the "stepping up" and "stepping down" of the voltage between the manufacturing facility and the end user constitutes "processing . . . tangible personal property for resale" under TG § 11-101(f)(1)(i).[1] And if the answer to that question is yes, then the second issue

---

[1] Even though the Comptroller did not petition for a writ of certiorari to review *Potomac Edison I*, we are not precluded at this juncture from revisiting that decision. *Loveday v. State*, 296 Md. 226, 233-34 (1983); *In re Levon A.*, 361 Md. 626, 636 (2000) ("Our right to review the judgment of the intermediate appellate court exists whether the issue raised in the second appeal was the same as or different from that raised in the first appeal."). In its petition for writ of certiorari, the Comptroller asked us to review the Appellate Court's decision in *Potomac Edison I* in the first two of the four questions it presented, which we granted:

> 1. Did the Appellate Court erroneously interpret Tax-General § 11-210(b), which exempts from sales-and-use tax "tangible personal property . . . used directly and predominantly in a production activity," to apply to the equipment that Potomac Edison uses not to produce electricity but to transmit and deliver it from out-of-state generators to its Maryland consumers?

11

is whether the Tax Court's finding that such equipment was used "directly and predominantly" in that activity is supported by substantial evidence. We take each question in turn.

1

The goal of statutory interpretation is to discern and effectuate the General Assembly's intent. *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024) (quoting *Blue v. Prince George's County*, 434 Md. 681, 689 (2013)). Our review begins with the statute's text, which we view in the context of the overall statutory scheme. *Id*. (quoting *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 169 (2021)). We "take the language as we find it, neither adding to nor deleting from it; we avoid forced or subtle interpretations; and

2. In applying the Appellate Court's erroneous interpretation of Tax-General § 11-210(b), did the Tax Court err in concluding that much of Potomac Edison's transmission and delivery equipment was used "directly and predominantly"—that is, more than 50 percent—in a production activity, when Potomac Edison's expert testified that the equipment is used both to deliver and process electricity simultaneously and concurrently and that neither delivery nor processing predominates?

3. Did the Appellate Court err in concluding that Tax-General § 13-508(a), which governs the time within which a taxpayer may seek a refund of tax paid pursuant to an assessment by the Comptroller, supersedes the generally-applicable four-year limitations period in Tax-General § 13-1104(g) and allows Potomac Edison to seek a refund of previously-paid sales-and-use tax that was *not* paid pursuant to an assessment by the Comptroller?

4. Did the Appellate Court err by compelling the State to pay interest on Potomac Edison's refund claim when the evidence showed that Potomac Edison paid the tax because of an "accounting system irregularity," a mistake not attributable to the State?

12

we avoid constructions that would negate portions of the language or render them meaningless." *Id*. (citation modified). We often refer to contemporaneous dictionary definitions to ascertain the "ordinary and popular" meaning of undefined terms used in the statute. *Id.* (quoting *FC-GEN Operations*, 482 Md. at 390). And we try to reconcile and harmonize the various provisions of a statutory scheme consistent with their "object and scope." *Id*. at 645 (quoting *Wheeling v. Selene Fin. LP*, 473 Md. 356, 377 (2021)). If the statute is unambiguous, we may consult legislative history to confirm our interpretation. *Blackstone v. Sharma*, 461 Md. 87, 113-14 (2018) (quoting *State v. Roshchin*, 446 Md. 128, 140 (2016)).

Tax exemptions are strictly construed against the taxpayer. *Broadway Servs., Inc. v. Comptroller,* 478 Md. 200, 215 (2022) (quoting *Supervisor of Assessments of Balt. Cnty. v. Treasurer of Bosley Methodist Church Graveyard*, 293 Md. 208, 212 (1982)). That rule of construction, however, does not permit "strained or unreasonable" interpretations or interpretations that are at odds with the purpose of the exemption that, here, was to "encourage the location, development and growth of industry in Maryland." *Comptroller of Treasury v. Disclosure, Inc.*, 340 Md. 675, 683 (1995) (citation modified).

With these principles in mind, we turn to the relevant statutory text. To recap: A sale of "tangible personal property" is exempt from the sales and use tax if such property is used "directly and predominantly in a production activity." TG § 11-210(b)(1). A "production activity" is defined as, among other things, (1) the "processing [of] tangible personal property for resale[,]" *id.* § 11-101(f)(1)(i), and (2) "generating electricity for sale or for use in another production activity[,]" *id.* § 11-101(f)(1)(ii). "Tangible personal

13

property," in turn, includes electricity. *Id.* § 11-101(k)(2)(iii). The "for resale" element in § 11-101(f)(1)(i) is not at issue.[2] So, Potomac Edison's purchases of conductor, substation, and transformer equipment are exempt if the equipment is "directly and predominantly" used in the "processing" of electricity.

The statute does not define the word "processing," so we turn to its dictionary definition. Webster's New World Dictionary of the American Language defined "process," in relevant part, as "a series of actions or operations conducing to an end." *Process*, WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 678 (1963). Similarly, The Random House Dictionary of the English Language defined "process," in relevant part, as: "1. a systematic series of actions directed to some end. 2. a specific, continuous action, operation, or series of changes." *Process*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, COLLEGE EDITION 1055 (1968).[3]

Although the ordinary meaning of "process" can encompass a broad range of activities, that does not render the definition of "production activity" ambiguous. *FC-GEN*

---

[2] In *Potomac Edison I*, the Appellate Court stated that Potomac Edison "does not own the power plant at which the electricity it supplies is generated, and that generating station is not located in Maryland," *Potomac Edison I*, 2019 WL 1897463, at *1, and neither party appears to have challenged that premise.

[3] In 1968, the Revenue and Taxes Article of the Maryland Annotated Code first codified a reduced rate of two percent for "manufacturing machinery and equipment," MD. CODE ANN., ART. 81, § 325(g) (1969 Repl. Vol.), which it defined to include "all machinery and equipment . . . which is used in manufacturing, assembling, processing or refining products for sale or in the generation of electricity, or research and development." *Id.* § 372(r). As such, we will consider the dictionary definitions of "process" from 1968. *See Lowery v. State*, 430 Md. 477, 491 (2013) (stating that courts use a dictionary that is "contemporaneous with the drafting and enacting of the language in the statute").

*Operations*, 482 Md. at 392 (observing that the statutory provision at issue is both broad and unambiguous). Applying those definitions here, the equipment that comprises Potomac Edison's transmission and distribution system subjects the electricity to a series of actions designed for the specific objective of delivering, over long distances, electricity generated out of State to Maryland customers at a voltage suitable for their use. Such equipment is, therefore, used for "processing" and, as such, performs a "production activity" under § 11-210(b)(1).

The Comptroller does not contend that the word "processing," viewed in isolation and given its ordinary meaning, does not embrace the voltage transformation activities performed by Potomac Edison's transmission and distribution system. Instead, she points to the bigger statutory picture and argues that the General Assembly chose to confine all electricity-related exemptions to subsection TG § 11-101(f)(1)(ii), which exempts equipment used in "generating electricity for sale or for use in another production activity[.]" The Comptroller argues that if TG § 11-101(f)(1)(i) applies to the electric power industry, then, given the breadth of the related and overlapping activities it includes—"assembling, manufacturing, processing, or refining"—that subsection "would entirely swallow the more specific reference to 'generating electricity'" in subsection (ii), rendering the latter superfluous. The Comptroller leans heavily on legislative history to support her interpretation, so we turn to that history next.

In 1968, the General Assembly reduced the tax rate for "manufacturing machinery and equipment," which was defined to include equipment used in "manufacturing, assembling, processing or refining products for sale or in the generation of electricity, or

15

research and development." 1968 Md. Laws, ch. 452, codified at MD. CODE ANN., ART. 81 §§ 324(s), 325(g), 372(r), 373(g) (1969 Repl. Vol.). And in 1979, the reduced rate was expanded into a full exemption. *See* 1979 Md. Laws, ch. 216.

The Comptroller asserts, and we agree, that the General Assembly's drafting choices in 1968 are best understood against the backdrop of this Court's prior caselaw, but we draw different conclusions from that history. The Comptroller points to *Frederick Electric Light & Power Co. v. Frederick City*, 84 Md. 599, 600 (1897), which involved a Frederick City municipal tax ordinance enacted to encourage industrial development in the city by exempting "machinery and manufacturing apparatus of all manufacturing industries" established within. In rejecting the taxpayer's claim that its electricity-generating plant was exempt, this Court found it unnecessary "to attempt a scientific discussion of what electricity is" and perceived little value in consulting "encyclopedias, dictionaries or other books endeavoring to define it." *Id.* at 600-01. Thus, we declined to decide whether the electric company "can properly be said to 'manufacture' electricity or whether it simply brings into action that which is already made[.]" *Id*. at 601. Instead, we framed the question as what "manufacturing industries" would mean to "the average man" of "fair and ordinary intelligence[.]" *Id*. Using that approach, we held that the term "manufacturing industries" as used in the ordinance, did not reach electric companies. *Id.* at 601-08. This analytical approach was not unusual for the time. *See, e.g.*, *Ky. Elec. Co. v. Buechel*, 143 S.W. 58, 59-61 (Ky. 1912).

In subsequent decades, we cited *Frederick Electric Light & Power* for the proposition that an electric company was not a manufacturer. *See, e.g.*, *American*

16

*Newspapers, Inc. v. McCardell*, 174 Md. 56, 58 (1938); *Comptroller of Treasury v. Crofton Co.*, 198 Md. 398, 403 (1951); *Suburban Propane Gas Corp. v. Tawes*, 205 Md. 83, 92 (1954). Courts from other states debated whether electricity generation constituted manufacturing, with some concluding that it did and others concluding that it did not. *See, e.g.*, *City of Ames v. State Tax Comm'n*, 71 N.W.2d 15, 22 (Iowa 1955); *Buechel*, 143 S.W. at 61; *Beggs v. Edison Elec. Light & Illuminating Co.*, 96 Ala. 295, 300 (1892); *People ex rel. Brush Elec. Illuminating Co. v. Wemple*, 129 N.Y. 543, 553 (1892); *Williams v. Park*, 56 A. 463, 465 (N.H. 1903); *Commonwealth v. N. Elec. Light & Power Co.*, 22 A. 839, 841 (Pa. 1891).

The General Assembly is presumed to have known about this Court's holdings when it drafted the 1968 statute. *See Comptroller v. Badlia Bros., LLC*, 490 Md. 163, 170 (2025) (citing *Consol. Constr. Servs., Inc. v. Simpson*, 372 Md. 434, 461 (2002)). The General Assembly knew in 1968 that, in holding that the "manufacturing" exemption did not apply, this Court in *Frederick Electric Light & Power* had intentionally not decided whether generating electricity is, in some scientific or technical sense, "manufacturing." Thus, the General Assembly's carve-out for "the generation of electricity" in the 1968 enactment is best understood as responding to that holding and clarifying that, regardless of how people understood the science of electricity and the meaning of "manufacturing," the reduced tax would apply to electricity generation.

That drafting choice, however, did not affect the meaning of "processing," let alone narrow its meaning. In fact, unlike the uncertainty reflected in cases addressing whether electricity generation constitutes "manufacturing," there does not appear to have been a

similar uncertainty about whether transmission and distribution of electricity constituted "processing." And the closest Maryland case on point—*Suburban Propane*—decided fourteen years before the 1968 enactment, indicates that this Court perceived a relevant distinction between "manufacturing" and "processing." 205 Md. at 88-90.

In *Suburban Propane*, this Court considered a propane distributor's claim under Article 81, § 370(f) of the 1951 Maryland Code, which exempted a manufacturer's or compounder's "tangible personal property" not "readily obtainable in Maryland," but *only* if the manufacturer also "process[ed]" the product being manufactured or compounded. *Id.* at 85. The taxpayer purchased the liquid propane, stored it, sometimes added various chemicals for safety and transportation purposes, and then delivered it to Maryland customers in tanks and bottles. *Id.* at 86-87. Thereafter, valves and regulators on those tanks and bottles reduced the pressure to convert the liquid propane into a gaseous form for use. *Id*. The equipment for which the taxpayer sought the exemption was "not readily obtainable in Maryland." *Id.* at 86. Nonetheless, we rejected the taxpayer's claim for an exemption because it had not shown that it was engaged in "manufacturing" or "compounding" within the meaning of § 370(f). *Id.* at 93-94. We reasoned that adding odorant and antifreeze to liquid propane was not "compounding" because it did not change the propane's BTU content, and reducing the pressure on liquid propane to convert it into a gaseous form for the consumer was not "manufacturing." *Id*. at 87-89.

Because the taxpayer in *Suburban Propane* could not surmount the threshold requirement that it be a manufacturer or compounder, we did not need to address whether the taxpayer engaged in "processing" liquid gas to bring it to the customer in a usable form.

18

*Id.* at 93-94. But we nevertheless observed that the Supreme Court of Alabama had determined, in *State v. Alabama Gas Corp.*, 62 So.2d 454 (Ala. 1952), that gas regulators used to reduce pressure for distribution to consumers *were* appliances used in "processing" gas. *Suburban Propane*, 205 Md. at 89-90 (citing *Ala. Gas Corp.*, 62 So.2d 454). Notably, the statutory scheme in Alabama at that time, much like the scheme here at issue, distinguished between "manufacturing" and "processing." *Ala. Gas Corp.*, 62 So.2d at 455. In *Suburban Propane*, we observed that the taxpayer in *Alabama Gas Corp.* proceeded solely under the theory that its equipment was used in "processing," and made "[n]o contention . . . that such regulators were used in compounding or manufacturing." *Suburban Propane*, 205 Md. at 89-90. In other words, over a decade before the 1968 enactment, this Court acknowledged that "manufacturing" gas—at issue in *Suburban Propane*—and "processing" gas—at issue in *Alabama Gas Corp.*—were two different activities. And our reference to *Alabama Gas Corp.* reflects this Court's awareness that this distinction was based on a similar distinction drawn by the Supreme Court of Alabama between generating electricity and the "stepping down" process necessary to bring electricity in a usable form to consumers.[4]

---

[4] The Alabama Supreme Court concluded that regulators "process" gas because, ten years earlier, it had concluded that transformers "process" electricity. *See Ala. Gas Corp.*, 62 So.2d at 456 (citing *Curry v. Ala. Power Co.*, 8 So.2d 521 (Ala. 1942)). The *Curry* Court had reasoned that transformers "process" electricity because "the purpose of a transformer is to put electricity in a form which is usable" and therefore "marketable to domestic users." *Curry*, 8 So.2d at 526 (citation modified). Thus, just as transformers "step down the voltage for domestic and other uses," gas regulators "reduce the pressure of gas to get it suitable for use by many customers, who could not otherwise use it." *Ala. Gas Corp.*, 62 So.2d at 456 (citation modified). So, when this Court in *Suburban Propane* recognized and found

The General Assembly's drafting choice in 1968 to list "processing" as an exempt activity alongside "manufacturing" is consistent with that distinction, which, we note, was preserved in 1988 when the exemption took its current form through the recodification of Article 81. The Revisor's Notes state that the exemption provisions in the newly minted Tax-General Article are "new language derived without substantive change . . . . [and] for clarity and brevity." MD. CODE ANN., TAX-GEN. § 11-101(d) (1988),[5] REVISOR'S NOTE; *see also* § 11-210(b) (1988), REVISOR'S NOTE.

The recodified version did, however, address an awkwardness in the prior statute that is worth noting. That is, the 1968 version defined the equipment that qualified for the reduced rate as "manufacturing . . . equipment," and then defined that term by referring to a list that included both "manufacturing" and "processing." MD. CODE ANN., ART. 81 § 324(s) (1969 Repl. Vol.). That structure was circular: "manufacturing" equipment included equipment used for "manufacturing." The General Assembly cleaned that up in 1988 by dropping "manufacturing equipment" as the operative term and replacing it with "production activity." *Compare* MD. CODE ANN., ART. 81 § 324(s) (1969 Repl. Vol.) *with* TG § 11-101(d)(1) (1988). And then it defined "production activity" to include, in TG § 11-101(d)(1)(i), both "manufacturing" and "processing" and, in TG § 11-101(d)(1)(ii), generating electricity.

---

significant the Alabama Supreme Court's distinction between "manufacturing" and "processing," it was cognizant that the Alabama court had applied such a distinction in the context of generating and transmitting electricity.

[5] For clarity's sake, we note that this language is now codified at TG § 11-101(f)(1).

20

Thus, although nothing substantively changed, the statute's structural change in the recodified version put "manufacturing" and "processing" on the same footing as two examples of "production activities." In making this change, the General Assembly codified what this Court had observed in *Suburban Propane*—that "manufacturing" and "processing" could serve different functions.[6] And by defining "tangible personal property" to include electricity, we conclude that the General Assembly intended the equipment used in "processing" electricity to be exempt.[7, 8]

The Comptroller further argues that Potomac Edison's transmission and distribution system is excluded from the definition of "production activity" under TG § 11-101(f)(2)(ii), which excludes the "maintaining [of] tangible personal property." The Comptroller argues that, because voltage "stepping up" has the effect of preserving the amount of electric power as it travels through the system by reducing line loss, it constitutes "maintaining." We disagree. The process of "stepping up" and "stepping down" the voltage does not preserve the electricity in the state that Potomac Edison receives it; rather, it changes the

---

[6] This is not to say that "manufacturing" and "processing" can never either overlap or appropriately describe the same activity.

[7] In rejecting the Comptroller's narrow interpretation of "processing," we note that the exemption applies, by its terms, to all "tangible personal property" processed for resale. The Comptroller does not explain how the meaning of "processing" can be narrowed for the electricity industry without also narrowing it for every other industry covered by the exemption. Without any limiting language in the statute itself, we decline to depart from the plain meaning of "processing" to narrow it for application in just one industry.

[8] Because we conclude that the production exemption distinguishes between "manufacturing" and "processing," we decline to apply the "substantial transformation" test, articulated in *Disclosure*, for determining whether an activity constitutes "manufacturing." 340 Md. at 686-87.

voltage. The change in voltage is what produces a usable, salable product. An activity that transforms the product does not become maintenance merely because the transformation preserves, to the extent possible, the amount of product.

2

Having determined that Potomac Edison's transmission and distribution equipment is used in a "production activity," we turn to the Comptroller's argument that such equipment is not "directly and predominantly" used for that function as required under TG § 11-210(b)(1).

"Directly and predominantly" is defined in the applicable regulations as "more than 50 percent of the time directly in production activities." COMAR 03.06.01.32-2B(2)(b). The Comptroller argues that Potomac Edison produced no evidence to satisfy this burden. She bases this argument on testimony from one of Potomac Edison's experts, Dr. Billy Don Russell, who testified to the effect that "delivery" of electricity was the predominant use and sole purpose of such equipment. The Comptroller acknowledges, however, that the same expert testified that Potomac Edison used its transmission and distribution system predominantly to process power. The Comptroller argues that, at most, the evidence established that such equipment was used "equally" to process power and to deliver it.

Potomac Edison responds by summarizing its experts' testimonies concerning the categories of equipment—conductor, transformer, and substation—that the Tax Court determined was used "directly and predominantly in a production activity." Both experts' testimonies described the technical operations of the equipment in detail, and explained how such equipment, by "stepping up" and "stepping down" the voltage, transforms the

22

high voltage electricity received from the generating plants into the lower voltages required for the customer's use.

The Tax Court concluded that the conductor, substation, and transformer equipment was used "directly and predominantly" for "processing." The Tax Court also concluded that the foundation support structures, such as the clamps, bolts, brackets, and other items, served only to physically support other components and thus did not qualify for the exemption. It found that the electric meters used to measure customer usage likewise did not qualify. Put simply, the Tax Court listened to the testimony, weighed competing technical accounts of the relevant equipment, and made findings that reasonable minds could reach on the record before it. Such findings were supported by substantial evidence and, as such, we will not disturb them.

C

The Comptroller challenges the timeliness of the Refund Request. Subsection 13-1104(g) sets a four-year limitations period for sales and use tax refund claims, and it is undisputed that, under that provision, much of the Refund Request was filed outside the four-year period.

The Appellate Court held that the Refund Request was governed by the 30-day period under § 13-508(a), which runs from the date of the notice of assessment, not the four-year period in § 13-1104(g), which runs from the payment date. *In re the Comptroller of Maryland*, 264 Md. App. at 39-41. And because Potomac Edison had filed its Refund Request within 30 days of the Comptroller's notice of assessment, the court held that the entire refund claim was timely under § 13-508(a). *Id.*

23

We disagree with the Appellate Court's analysis. We start with TG § 13-1104(g), which provides:

Except as provided in § 13-508 of this title, a claim for refund of sales and use tax may not be filed after 4 years from the date the tax was paid.

Under its plain text, claims governed by § 13-508 are excepted from the four-year limitations period. So, we turn to § 13-508(a), which provides:

Within 30 days after the date on which a notice of assessment of the [sales and use tax] is mailed, a person or governmental unit against which the assessment is made may submit to the tax collector:
(1)     an application for revision of the assessment; or
(2)     except for the public service company franchise tax, if the assessment is paid, a claim for a refund.

The Appellate Court reasoned that TG § 13-508(a) applies here because the Refund Request "was made in response to the Notice of Assessment that brought the audit to an end and was mailed to it by the Comptroller's Office." *In re the Comptroller of Maryland*, 264 Md. App. at 40. On that reading, that Potomac Edison filed the Refund Request in response to the notice of assessment is the relevant fact that makes § 13-508(a) applicable.

But there is a disconnect in that analysis because the Refund Request pertained to Potomac Edison's purchases of *different* equipment than the equipment to which the notice of assessment applied.[9] The notice of assessment imposed taxes on specific equipment purchases for which no taxes were previously paid. When a notice of assessment is issued,

---

[9] In the Tax Court, the parties stipulated that: (1) Potomac Edison "paid Maryland sales and use tax on its purchases of the items identified in the refund schedules[]"; and (2) Potomac Edison "did not pay Maryland sales and use tax on its purchases of the items identified in the Comptroller's assessment and [Potomac Edison]'s assessment reduction schedules until after the Notification of Assessment was issued by the Comptroller[]"; and (3) all such purchases were "substantiated with invoices or receipts."

24

§ 13-508 gives the taxpayer two options—both of which must be exercised within 30 days—for contesting it: (1) challenge the assessment by seeking revision; or (2) pay the assessed tax and seek a refund of that payment. By its plain text, it's the paid assessment that's refundable under § 13-508, not prior tax payments made on *other* equipment purchases that were not subject to the assessment.[10]

The Appellate Court's interpretation puts § 13-508 into conflict with § 13-1104(g), allowing the former to revive claims that were rendered stale under the latter. We instead opt for an interpretation that aligns with and harmonizes the plain text of both statutes. *See Lyles v. Santander Consumer USA Inc.*, 492 Md. 670, 683 (2025) (quoting *Adventist Healthcare, Inc. v. Behram*, 488 Md. 410, 432-34 (2024)). Thus, we hold that § 13-1104(g) provides the general rule for sales and use tax refund claims, and § 13-508(a) provides a narrow exception for the specific situation in which a taxpayer pays an assessed tax in response to a notice of assessment and seeks a refund of that payment within the 30-day window.

Our interpretation is consistent with the purpose of statutes of limitations, which are designed "to encourage prompt resolution of claims, to suppress stale claims, and to avoid the problems associated with extended delays in bringing a cause of action, including missing witnesses, faded memories, and the loss of evidence." *Roman Cath. Archbishop of*

---

[10] Even if the assessment sought to impose sales and use tax on the same equipment on which Potomac Edison had already paid such taxes, Potomac Edison's Refund Request as to the second payment—that is, the payment it made in response to the assessment— would be governed by the 30-day period under §13-508(a). But a refund request as to the first payment would remain governed by the four-year period under § 13-1104(g).

*Wash. v. Doe*, 489 Md. 514, 530 (2025) (citation omitted). The two limitations periods at issue here reflect the General Assembly's balancing of those interests. The taxpayer needs a fair chance to discover that a tax was paid by mistake and seek its return, and the State needs to know, at some point, that its books are closed. Thus, the General Assembly determined that four years is long enough for a taxpayer to identify a mistaken payment through internal review or a change in legal interpretation, but short enough to give the State finality.

The 30-day window under § 13-508(a) addresses a different situation. A taxpayer who has just received an assessment notice does not need years to discover the disputed payment because the assessment puts the dispute squarely on the table, requiring the taxpayer to pay the assessment or dispute it. The General Assembly determined that 30 days is sufficient time to request a refund if the taxpayer pays the assessment under protest.

Potomac Edison's Refund Request was for taxes paid voluntarily during the audit period of August 1, 2003, through July 31, 2007—payments made in the ordinary course of business, not in satisfaction of a notice of assessment. Accordingly, the Refund Request is governed by the four-year limitations period in § 13-1104(g), rendering it untimely except as to those payments made between April 1, 2007, and July 31, 2007.

Having found that § 13-1104(g) *does* apply, we will remand to the Appellate Court to address Potomac Edison's arguments, raised but not decided there, that the parties mutually agreed to extend their respective deadlines and that the Comptroller is estopped from asserting otherwise.

26

D

We turn now to Potomac Edison's claim for interest. Subsection 13-603(a) of the Tax-General Article requires the Comptroller to pay interest on an approved refund. Subsection 13-603(b) makes an exception for a refund "based on . . . an error or mistake of the claimant not attributable to the State." TG § 13-603(b)(2)(i). The exception applies only if both conditions are met: the overpayment must be the taxpayer's mistake, *and* it must not be attributable to the State. *Comptroller of Treasury v. Sci. Applications Int'l Corp.*, 405 Md. 185, 199 (2008).

The "attributable to the State" element is the one at issue here. Relying on a brief filed by Potomac Edison before the Comptroller's hearing officer, the Comptroller argues that Potomac Edison "erroneously paid the sales-and-use tax it seeks in its refund claim due to 'accounting system irregularities.'" That Potomac Edison paid such taxes on some, but not other, equipment purchases during the audit period shows, the Comptroller argues, that its accounting irregularities were not attributable to the State. The Comptroller's argument misses the mark.

In *Science Applications*, we adopted the Tax Court's formulation from a prior case that "an error is attributable to the State when a taxpayer, using reasonable judgment under the circumstances, is led by the laws, regulations, or policies expressed by the State to the mistaken conclusion that tax is owed." *Id.* at 201 (quoting *DeBois Textiles Int'l, Ltd. v. Comptroller*, Income Tax No. 1630, 1985 WL 6117 (Md. Tax Ct. Aug. 23, 1985) (citation modified)). In other words, we held that "attributable to the State" under § 13-603(b) "means that the mistake or error can be said to be caused by the State." *Id*. at 203. Thus,

"if the State requires a taxpayer to pay some amount by assessment, and the taxpayer faces penalties for non-compliance, the taxpayer cannot be said to have made a mistake when it pays the required amount." *Id*. at 204. That's what happened here: Potomac Edison was assessed interest and a penalty on the taxes it did *not* pay during the same period, thus it's fair to conclude that Potomac Edison would have faced further interest and penalty risk had it *not* made the Audit Period Payments.

When the Comptroller and a taxpayer disagree over whether a tax is owed, the taxpayer has a choice: It can pay the tax and seek a refund, or it can refuse to pay the tax and challenge it. The statute allocates the risks inherent in that choice. If the taxpayer pays and turns out to be right, the Comptroller pays interest under § 13-603(a); if the taxpayer refuses to pay and turns out to be wrong, the taxpayer owes interest under § 13-601(a) and penalties under § 13-701(a). In other words, when the State takes the position that a tax is owed, the party sitting on the money bears the risk of being wrong.

Here, Potomac Edison apparently intended to take the latter approach (refuse to pay and challenge it) but, due to accounting irregularities, inadvertently paid taxes on some of the equipment purchases. Notably, there is no dispute that, from the Comptroller's perspective when the Audit Period Payments were made, Potomac Edison would have to pay the disputed tax sooner or later. Thus, at bottom, the choice Potomac Edison faced between paying and seeking a refund or not paying and challenging the inevitable assessment existed only because of the Comptroller's position that taxes were due on such

28

purchases. That is what made the Audit Period Payments attributable to the State under § 13-603(b)(2)(i).[11]

Accordingly, we affirm the Tax Court's finding that Potomac Edison is entitled to interest on the Refund Request, to the extent it was timely.

III

In conclusion, we hold that Potomac Edison's conductor, substation, and transformer equipment is used "directly and predominantly in a production activity" within the meaning of Tax-General § 11-210(b)(1), and that the Tax Court's findings to that effect are supported by substantial evidence. Accordingly, we affirm the Appellate Court of Maryland's judgment on that question.

We hold that the timeliness of Potomac Edison's Refund Request is governed by the four-year limitations period in § 13-1104(g), not by the 30-day window in § 13-508(a). We therefore reverse the Appellate Court's contrary judgment on that question and remand to that court to address Potomac Edison's arguments concerning the extension agreements and equitable estoppel.

---

[11] Think of it this way. Suppose a taxpayer faced with the same choice as Potomac Edison decides to pay the tax, cuts and signs a check, places the check in an envelope, places a stamp on the envelope, places the envelope in a pile of outgoing mail, and then later—before the mail is picked up—changes its mind, resolving to refuse payment and challenge the tax. But, for whatever reason, the taxpayer forgets to take the envelope out of the outgoing mail pile, and thus inadvertently pays the tax. It would make no sense to say that that the taxpayer would not be entitled to interest simply because it had intended (but neglected) to pull the envelope from the outgoing mail pile, but that it *would* have been entitled to interest had it never changed its mind. The salient fact is that the taxpayer was put to the choice in the first place due to the State's position that the tax was owed.

29

And finally, we hold that Potomac Edison is entitled to interest on its Refund Request under § 13-603, to the extent it was timely, and thus we affirm the Appellate Court's judgment on that issue.[12]

> **JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE SPLIT EQUALLY BY PETITIONER AND RESPONDENT.**

---

[12] We will refrain from quantifying the net monetary effect of our holdings, as a final accounting cannot be determined until the Appellate Court resolves the remaining statute of limitations issues.

Circuit Court for Anne Arundel County
Case No.: C-02-CV-22-000534
Argued: October 1, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 12

September Term, 2025

_____

COMPTROLLER OF MARYLAND

v.

THE POTOMAC EDISON COMPANY

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Dissenting Opinion by Killough, J.

_____

Filed: July 17, 2026

The General Assembly exempted the generation of electricity, not the importation of it. Potomac Edison generates nothing. By its own concession, it is a transmission and distribution intermediary[1]—a conduit between out-of-state generators and Maryland consumers. It buys electricity made elsewhere, moves it across state lines, and sells it. That is the business of a middleman, not a manufacturer. To treat it as one for purposes of the "production activity" tax exemption does violence to the statutory text, the legislative purpose, and any recognizable understanding of the production activities the General Assembly chose to exempt.

The Comptroller correctly determined that Potomac Edison's equipment does not qualify for the tax exemption. The Tax Court agreed in a reasoned 2015 opinion. The circuit court affirmed on judicial review. Three independent decision-makers, examining the same record, reached the same conclusion through reasoned analysis of the relevant legal authority and the factual record. That should have been the end of it.

It was not. The Appellate Court reversed in *Potomac Edison Co. v. Comptroller of the Treasury*, No. 1645, Sept. Term, 2016, 2019 WL 1897463 (Md. App. Ct. Apr. 29, 2019) (*Potomac Edison I*), with no deference to the Comptroller's interpretation and no engagement with the Tax Court's analysis. It then invented a framework on remand requiring the Tax Court to sort the components of an integral, single-purpose system into

---

[1] Potomac Edison's own public-facing materials confirm the point. The company's website has compared its "power plants" to "manufacturing plants" and its "distribution system" to "the retail stores that deliver products to customers." The company's own characterization of its business matches the Comptroller's reading of the statute, not its litigation position in this Court.

"buckets" of equipment that supposedly do and do not qualify—a sorting exercise that Potomac Edison's own expert testified was impossible because the equipment has "no predominance" among its functions and a "sole purpose" of delivery.

The case made its way back to the Appellate Court a second time, this time on cross-appeals from the circuit court's judicial review of the Tax Court's decision on remand. *Matter of Comptroller of Maryland*, 264 Md. App. 23 (2024) (*Potomac Edison II*). The Appellate Court affirmed the Tax Court's bucket-sorting analysis, holding itself bound by *Potomac Edison I* as the law of the case. *Id.* at 48-50. The Appellate Court also reversed the circuit court's limitations ruling, holding that the Tax Court's refund award was timely under § 13-508(a). *Id.* at 41.

*Potomac Edison I* was wrongly decided. The Appellate Court below acknowledged in *Potomac Edison II* that it was constrained by that decision as law of the case. *Id.* at 48. The Majority had the opportunity to correct the 2019 error. Instead, it compounds it—ratifying *Potomac Edison I*'s flawed statutory interpretation and going further still, endorsing the Tax Court's bucket-sorting on remand and the Appellate Court's affirmance of it in *Potomac Edison II* and reaching a result that Potomac Edison's own witnesses said was not possible.

To sustain *Potomac Edison I*, the Majority makes a series of analytical moves, each of which I disagree with. It treats the Appellate Court's 2019 dictionary-driven interpretation as a fixed point in the analysis, despite its silence on the legislative history that gave rise to the tax provision at issue in the first place. It reaches across seven decades to extract dicta from an Alabama case discussed in passing in a 1954 Maryland decision

2

while ignoring what that 1954 Maryland decision actually held. It adopts a definition of "processing" so broad it has no limiting principle, then disclaims this Court's judicial tests in a footnote to escape the implications of that choice. It adopts a novel rule that the standard of review is the agency's to forfeit, holding that the Comptroller's interpretation of the statute loses the deference it is owed because the Comptroller never asked for it by name.

It reads the canon of strict construction as ornamental rather than operative. It renders Tax-General § 11-101(f)(1)(ii) as surplusage. It accords equipment used to perform a "taxable service" an exemption reserved for equipment used in a "production activity" — a designation the statute expressly forecloses. It does not cite Tax-General § 11-101(m)(11), the provision that classifies the very activity at issue here as a taxable service. And it applies substantial evidence review asymmetrically, denying deference to the Tax Court when it ruled against Potomac Edison in 2015 and embracing deference to the same Tax Court when it was obligated to rule for Potomac Edison in 2022. Together, these moves work to preserve a 2019 decision that should not be saved.

The burden was on Potomac Edison—by statute, Tax-General § 11-103(b), and by longstanding precedent, *State Dep't of Assess. & Tax'n v. Belcher*, 315 Md. 111, 118 (1989)—to establish its entitlement to the exemption. It has not carried that burden. It cannot, because the General Assembly never authorized this exemption for the transmission and distribution of electricity.

The Tax Court got this case right the first time in 2015; *Potomac Edison I* got it wrong; and *Potomac II* compounded the mistake. The appropriate disposition is to overrule

*Potomac Edison I*, restore the agency's well-reasoned determination, and reverse. The remand framework, the bucket analysis, the substantial evidence questions about findings on remand, the limitations question, the interest question—none of these need to be addressed at all. There is no transmission and distribution exemption. There never was such an exemption. Everything that has happened since 2015 is the consequence of an error this Court should have corrected. The Majority opinion does not do that. Therefore, I respectfully dissent.

### Standard of Review

Because this case came before the intermediate appellate court on two separate occasions, it is within this Court's power to review the entire record, including the initial appellate decision in *Potomac Edison I*. *See Loveday v. State*, 296 Md. 226, 234 (1983). The Majority agrees on this point. Maj. Slip Op. at 12 n.1. The questions presented in this Court's grant of certiorari are broad enough to encompass the statutory interpretation question decided in *Potomac Edison I*, and this Court has both the authority and obligation to correct any error of law in that decision.

When reviewing a decision of an administrative agency, this Court "looks through the decision of the circuit court and intermediate appellate court and evaluates the decision of the agency." *Comptroller of Maryland v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 359 (2022) (citing *Gore Enter. Holdings, Inc. v. Comptroller*, 437 Md. 492, 503 (2014)). The Tax Court is an adjudicatory administrative agency. *Id.* at 358. This Court reviews the Tax Court's factual findings under the substantial evidence standard, which asks whether "a reasoning mind reasonably could have reached the factual conclusion the agency

4

reached." *Frey v. Comptroller*, 422 Md. 111, 137 (2011). The agency's decision is interpreted "in the light most favorable to the agency[.]" *Broadway Servs., Inc. v. Comptroller*, 478 Md. 200, 214 (2022).

Deference here runs on two tracks, and they belong to two agencies. The factual track belongs to the Tax Court: its findings are reviewed for substantial evidence, with the reviewing court "defer[ring] to the facts found and the inferences drawn by the agency when the record supports those findings and inferences," *FC-GEN Operations Invs. LLC*, 482 Md. at 359, and its decision read "in the light most favorable to the agency," *Broadway Servs., Inc.*, 478 Md. at 214–15. The Tax Court need not administer the statute to earn that review; it earns it as the tribunal that heard the evidence. *Gore Enter. Holdings, Inc.*, 437 Md. at 503-04 (the Tax Court "receive[s] the same judicial review as other administrative agencies[,]" and "[i]t is not [this Court's] place to make an independent original estimate of or decision on the evidence" (internal citations and quotation marks omitted)). The interpretive track belongs to the Comptroller. When a tax statute is construed, the agency owed deference is the Comptroller—the agency that administers the sales and use tax and promulgates the regulations under it—and its construction is entitled to "great weight." *FC-GEN Operations Invs. LLC*, 482 Md. at 377; *Frey*, 422 Md. at 138.

The Majority withholds both. It denies the Comptroller the deference its interpretation of the tax statute is owed, and it denies the Tax Court the substantial-evidence deference its findings are owed—but only the findings it made in 2015. The same court's findings on remand in 2022 receive full deference. Maj. Slip Op. at 24–26. A departure of that kind requires explanation. The Majority offers none.

5

Most importantly here, this Court "strictly construe[s] tax exemptions against the taxpayer[,]" resolving ambiguities in favor of the State. *Broadway Servs., Inc.*, 478 Md. at 215. "[B]efore any claimant can obtain an exemption, it is incumbent upon him to show affirmatively that the alleged exemption has been clearly allowed by law." *Belcher*, 315 Md. at 118; *see* Tax-General § 11-103(b). "It is only where the deliberate purpose of the Legislature to grant an exemption is expressed in clear and unequivocal terms that a claim to an exemption can be maintained." *Belcher*, 315 Md. at 118. "To doubt an exemption is to deny it." *Suburban Propane Gas Corp. v. Tawes*, 205 Md. 83, 87 (1954); *State Dep't of Assess. & Tax'n v. Consol. Coal Sales Co.*, 382 Md. 439, 455 (2004) (internal quotation marks and citations omitted). These rules are not optional, and they are not boilerplate. They place the burden squarely on Potomac Edison to demonstrate that the General Assembly clearly and unequivocally exempted the equipment at issue. As discussed in detail below, Potomac Edison cannot meet that burden.

**Statutory and Regulatory Framework**

Eight provisions and one regulation drive this case. They are collected here for ease of reference:

> **Tax-General § 11-210(b)(1)** — The production activity exemption. Equipment used directly and predominantly in a production activity is exempt from sales and use tax. This is the provision Potomac Edison invokes.
>
> **Tax-General § 11-101(f)(1)(i)** — Defines "production activity" to include "assembling, manufacturing, processing, or refining tangible personal property for resale." The general provision on which the Majority relies.
>
> **Tax-General § 11-101(f)(1)(ii)** — Defines "production activity" to include "generating electricity for sale or for use in another production activity." The electricity-specific provision. Potomac Edison concedes it does not generate

6

electricity in Maryland and does not qualify under this provision. *See Potomac Edison Co. v. Maryland Comptroller of the Treasury*, No. 1645, Sept. Term, 2016, 2019 WL 1897463 at *4 n.2.

**Tax-General § 11-101(f)(2)(ii)** — Expressly excludes "maintaining tangible personal property" from the definition of production activity.

**Tax-General § 11-101(k)(2)(iii)** — Defines "tangible personal property" to include electricity.

**Tax-General § 11-101(m)(11)** — Classifies "a transportation service for transmission, distribution, or delivery of electricity" as a taxable service on the condition that "the sale or use of the electricity . . . is subject to sales and use tax." This is the General Assembly's explicit policy choice about what Potomac Edison does: the activity is taxed, not exempted. Equipment used to perform a taxable service cannot also be exempt as equipment used in a production activity.

**Tax-General § 11-103(b)** — Places the burden of proving exemption on the taxpayer.

**COMAR 03.06.01.32-2(B)(2)** — Defines "used directly and predominantly in a production activity" to require that the property be "integral and essential to the production activity" and "used more than 50 percent of the time directly in production activities."

## Discussion

I.      **The Deregulation Context That *Potomac Edison I* Ignored and the Majority Now Inherits.**

The Appellate Court's analysis in *Potomac Edison I* omitted the statutory history of Section 11 of the Tax-General Article, and the Majority opinion repeats this oversight. Understanding this history is crucial because it reveals why subsections (f)(1)(ii) and (m)(11) were enacted and exposes the central interpretive flaw in *Potomac Edison I*. Without this context, the statute's legislative purpose is overlooked.

7

Prior to the deregulation of the electric power industry in Maryland in the late 1990s, electricity was billed through a "bundled transaction," meaning the utility company "included a single charge that was subject to the sales tax for the generation and transmission and distribution of electricity." With "the onset of the deregulation of the industry," however, "it was possible for one company . . . to generate the electricity while another company would be transmitting . . . that electricity." As the Assistant Director of the Compliance Division in the Comptroller's office testified, this change created an opening whereby a utility company that only transmits and distributes electricity could now potentially claim an exemption from sales and use tax, resulting in a "20 to 25 million a year" revenue loss for the State. To ameliorate this problem, the Department of Legislative Services and the Comptroller brought it to the General Assembly's attention. The General Assembly responded by amending Tax-General § 11-101 in two complementary ways: it narrowed the production activity exemption for electricity to "generating electricity for sale or for use in another production activity," TG § 11-101(f)(1)(ii), and it classified "a transportation service for transmission, distribution, or delivery of electricity" as a taxable service, TG § 11-101(m)(11). Per the Assistant Director's testimony, the bill that ultimately passed "acknowledge the position of the Comptroller" and "clarified . . . the intent of the legislature" to ensure that the sales and use exemption "remained limited to the generation of electricity when it was for sale and for use in another production activity[.]" In short, generation is exempted; transmission and distribution are taxed. These provisions reflect a coherent policy choice directly responding to structural changes in the industry.

The *Potomac Edison I* opinion does not mention this legislative history. Instead, it relied on a 1968 dictionary to find a generic definition of "processing" and declared the statute "plain and unambiguous." *Potomac Edison I*, 2019 WL 1897463 at *9. However, a court does not establish that a statute is plain and unambiguous merely by consulting a dictionary. Proper interpretation requires reading the text in light of the statutory structure and the legislative context that shaped it. The Appellate Court failed to consider why the General Assembly amended Tax-General § 11-101 in the late 1990s, why it classified transmission and distribution as taxable services in § 11-101(m)(11), and why it simultaneously narrowed the production activity exemption for electricity to generation alone in § 11-101(f)(1)(ii). The deregulation history provides a single, coherent explanation for these legislative choices. The Appellate Court's omission of this history suggests that its "plain and unambiguous" reading is disconnected from the statute's legislative reality.

The Majority inherits this defect. It does not mention deregulation. It does not explain why the General Assembly chose to address the transmission and distribution of electricity at all in the 1990s. It does not explain why § 11-101(m)(11) exists or even cite that provision. A statute that the General Assembly deliberately amended to close a specific revenue gap cannot be read in a way that re-opens that gap by judicial construction. Yet that is precisely what the Majority's reading accomplishes. Under the Majority's holding, a utility that does nothing but transmit and distribute electricity—the very activity the General Assembly singled out as taxable—is exempt from sales and use tax on the equipment used to perform that activity. The deregulation history makes that result not merely doubtful but impossible: it is the very outcome the General Assembly amended the

9

statute to prevent. The consequence for this case follows directly from the line the legislature drew. Potomac Edison performs an activity the legislature classified as a taxable service. Equipment used to perform that taxable service cannot simultaneously be exempt as equipment used in a production activity. The two designations are mutually exclusive, and the General Assembly chose between them in 1999.

The Tax Court in 2015 understood this history and said so. That understanding was not a creative gloss; it was the product of the Tax Court doing exactly what tax courts exist to do—reading a tax statute in light of the legislative purpose it was enacted to serve. The Majority's silence on that history—like the Appellate Court's before it—leaves the statute the General Assembly actually enacted uninterpreted.

## II. The 2015 Tax Court Ruling Was Correct.

On January 22, 2015, after a contested evidentiary hearing and full briefing, the Tax Court issued a reasoned opinion concluding that Potomac Edison's transmission and distribution of electricity is not a "production activity" within the meaning of Tax-General § 11-210(b)(1). Instead, the Tax Court held that Potomac Edison's transmission and distribution of electricity was a taxable service pursuant to Tax-General § 11-101(m)(11). The Tax Court grounded that conclusion in the structure of the statute, the legislative history, and the Comptroller's long-standing administrative practice. As the Tax Court explained:

> Following the deregulation of electricity, there was concern that the definition of "Taxable price" in Tax-General Article 11-101(l)(3)(i)(1) would render charges for transmission of electricity exempt from tax. To address that concern, legislation was enacted that narrowed the definition of "production activity" in Tax-General Article 11-101(f)(1)(ii) to "generating

10

electricity for sale or for use in another production activity" and expanded the definition of "taxable service" in Tax-General Article 11-101(k)(1)(11)[2] to include "a transportation service for transmission, distribution, or delivery of electricity or natural gas, if the sale or use of the electricity or natural gas is subject to the sales and use tax." Thus, the transmission of electricity is a taxable service and not a production activity . . . .

That was a careful, considered, and reasoned interpretation—grounded in the very kind of agency expertise to which this Court has historically extended deference. Prior to the Tax Court's 2015 decision, the Comptroller's hearing officer had reached the same conclusion through similar reasoning, finding that there was no "legislative history or revisor's notes indicating that the inclusion of electricity within the definition of tangible personal property within Tax-General Article § 11-101(f)(i-ii) was an effort to expand the scope of Tax-General Article § 11-210." The circuit court affirmed the Tax Court on judicial review.

Then the intermediate appellate court intervened. The Appellate Court reversed—not on substantial evidence grounds and not by identifying any defect in the Tax Court's reasoning. Rather, the intermediate appellate court adopted a generic dictionary definition of "processing" and announced that this definition applied to electricity as a matter of law. *See Potomac Edison I*, 2019 WL at 1897463 *9. It did so without engaging the Tax Court's structural reading of the statute. It did so without acknowledging the Comptroller's consistent administrative position. It did so without engaging the deregulation history that

---

[2] When the Tax Court issued its January 22, 2015 opinion, the taxable services provision was codified at Tax-General Article § 11-101(k)(1)(11). It has since been recodified to § 11-101(m)(11). The substance is identical; only the subsection designation has changed. For clarity and consistency with the Majority opinion, I cite the current location, § 11-101(m)(11), throughout this dissent.

prompted the General Assembly to amend the statute in the first place. And it did so without grappling with the most obvious problem with its reading: that subsection (f)(1)(ii) specifically addressed electricity and limited the exemption to generation and that subsection (m)(11) classified the transmission and distribution of electricity as a taxable service.

Indeed, the *Potomac Edison I* opinion is striking not just for what it overlooked, but also for what it acknowledged and then set aside. The Appellate Court expressly recognized "that the Tax Court is entitled to deference with respect to its interpretations of the tax statutes it administers." *Potomac Edison I*, 2019 WL 1897463 at *9 (citing *Frey*, 422 Md. at 138). It expressly recognized that tax exemptions are strictly construed. *Id.* (citing *Comptroller of Treasury v. Disclosure, Inc.*, 340 Md. 675, 683 (1995). It expressly recognized that "if any real doubt exists as to the propriety of [a tax] exemption that doubt must be resolved in favor of the State." *Id.* (quoting *Green v. Church of Jesus Christ of Latter-Day Saints*, 430 Md. 119, 135 (2013)). Each of those doctrines, properly applied, would have required affirmance of the Comptroller's decision, as accepted by the Tax Court. The Appellate Court swept all three aside in a single sentence: "At the same time, we are being asked to interpret statutory language that appears plain and unambiguous." *Id.*

That single sentence does the work that the rest of the Appellate Court's analysis cannot. By declaring the text "plain and unambiguous," the Appellate Court excused itself from applying deference, strict construction, and the taxpayer's burden of proof—all in one stroke—without examining the statute's structure or history or the factual record. The

12

Appellate Court did not ask whether subsections (f)(1)(ii) and (m)(11), read together, foreclose its reading. It did not ask whether the deregulation history that produced those provisions illuminated their meaning. It consulted a dictionary and declared the question answered. That is reasoning by assertion, not statutory interpretation. And it is precisely what the Majority now repeats—acknowledging the doctrines that favor the Comptroller, then declaring the text plain enough to set them aside.

Having created that legal predicate as a matter of law, the Appellate Court then remanded—requiring the Tax Court to take the next implausible step. It directed the Tax Court to determine which categories of Potomac Edison's equipment were used "directly and predominantly" in the "processing" of electricity, an activity the Appellate Court had now conjured into the statute. The Tax Court, doing its best within an impossible framework, sorted the equipment into "buckets" and found that some equipment qualified while others did not. But Potomac Edison's own expert had testified that no such sorting was possible, because the T&D System is "a single thing" with "no predominance" among its functions and a "sole purpose" of transmitting energy to customers. The framework demanded a result the record could not support.

The Majority now defends this entire structure. It does so by applying substantial-evidence deference to the Tax Court's findings on remand, characterizing the bucket-sorting exercise as a permissible exercise of agency fact-finding. Maj. Slip Op. at 23, 29-30). But this defense rests on a defect the Majority does not address: the asymmetry between how the Tax Court's work has been treated. The Tax Court in 2015 ruled against Potomac Edison, expressly adopting the Comptroller's 2012 legal analysis in a decision

13

grounded in the statutory text, legislative history, and agency expertise; that ruling received no deference and was reversed as a matter of law. The Tax Court ruled for Potomac Edison on November 30, 2021, by implementing the bucket-sorting required by the remand framework; that ruling now receives full substantial evidence deference. The doctrine of agency deference does not operate that way. Either the Tax Court's careful work is entitled to respect, or it is not. It cannot be entitled to respect only when it produces a particular outcome.

### III. The Majority Withholds Deference That the Record Plainly Establishes Is Owed

#### A. *The Majority Recites the Governing Standard, Then Sets it Aside*

The Majority correctly states where interpretive deference lies. "[I]n the context of interpreting tax laws, the agency to which deference may be owed is the Comptroller, not the Tax Court." Maj. Slip Op. at 11 (citing *FC-GEN Operations Invs. LLC*, 482 Md. at 377). That is a fair reading of *FC-GEN*. The Comptroller administers the sales and use tax, promulgates the regulations under it, and issues the determinations that construe it. When a tax statute is interpreted, the Comptroller's construction is the one to which a reviewing court owes deference. On that point there is no disagreement.

But the Comptroller's final determination of Potomac Edison's request for a tax credit was "No." The Comptroller stated that: "The crux of the dispute in this case is whether the equipment such as conductor cables, transformers, substations, support structures, and other items are involved in a 'production activity.' Stated otherwise, the issue is whether these items 'produce' electricity." Construing the statute and the

14

regulation, the Comptroller held that the regulation *segregates* "assembling, manufacturing, processing, or refining" of tangible personal property from "generating electricity," and that the equipment is not on a "production activity site[,]" because it does not perform a production activity.  That is the Comptroller construing the statute and its own regulation. It is the heartland of interpretive deference, not the periphery.

The Tax Court agreed with the Comptroller's legal conclusion that Tax-General § 11-210(b)(1) excludes the transmission and distribution of electricity from the production activity exemption. That construction—the construction of the only agency the Majority concedes is entitled to interpretive deference—resolves this case. The transmission and distribution of electricity is a taxable service, not a production activity. Under the rule the Majority recites, that interpretation was owed deference and required affirmance. The Majority states the rule in a single sentence and then proceeds as though it had not.

The Majority's stated reason for setting the rule aside is that "the Comptroller did not contend, let alone demonstrate, that the conditions warranting agency deference are satisfied here." Maj. Slip Op. at 11. That reason cannot be reconciled with this Court's precedent. The standard of review is not the litigants' to waive. "[A] party cannot 'waive' the proper standard of review by failing to argue it . . . because it is the court, not the parties, which must determine the standard of review." *Baltimore Police Department v. Open Justice Baltimore*, 485 Md. 605, 655 (2023) (citations and internal quotation marks omitted). The Comptroller's interpretation is owed the deference the law provides whether or not the Comptroller asked for it by name. Whether the conditions for that deference are satisfied is a question for the record, and the record answers it.

15

Interpretive deference is not the only deference the Majority withholds. The Tax Court's factual findings are reviewed for substantial evidence. *Gore Enter. Holdings*, 437 Md. at 503; *FC-GEN*, 482 Md. at 359. *FC-GEN* did not disturb that standard. It addressed only which agency's *interpretation* controls—not whether the Tax Court's *findings* receive the deference every administrative factfinder receives. The Tax Court need not administer the statute to earn substantial-evidence review of what it finds. It earns that review because it is the tribunal that heard the evidence.

The Majority concedes as much in practice. It defers to the Tax Court's 2021 findings on remand, treating the bucket-sorting exercise as permissible agency factfinding. Maj. Slip Op. at 24–26. But the 2015 ruling rested on factual findings too—on the operation of Potomac Edison's T&D System, on the competing expert testimony, on the deregulation history that produced the statutory amendments. The Majority gave those findings no substantial-evidence review at all. The same tribunal, performing the same factfinding function, received full deference in 2021 and none in 2015. The only variable is the outcome each ruling produced.

That variable is an important consideration that the Majority ignores because the 2021 findings the Majority credits were extracted under a framework the record could not support. Potomac Edison's own expert testified that the T&D System is "a single thing," with "no predominance" among its functions and a "sole purpose" of delivery. The remand required the Tax Court to do precisely what that testimony said could not be done: sort the system by predominance. The Majority extends deference to the findings the record could

16

not support and denies it to the findings the record sustained. A standard of review that turns on the result it produces is not a standard of review.

**B. The Conditions for Deference Are Satisfied on This Record**

The Majority's analysis of the production activity exemption begins by setting aside the conclusions of the three prior decision-makers—the Comptroller's hearing officer, the Tax Court in 2015, and the circuit court—that the exemption does not apply. The Majority cannot avoid that construction by observing the Comptroller did not request deference by name. What remains is whether the conditions that make the Comptroller's construction binding are present. *FC-GEN* supplies the test. Deference is owed "when the interpretation resulted from a process of reasoned elaboration by the agency, when the agency has applied that interpretation consistently over time, or when the interpretation is the product of contested adversarial proceedings or formal rule making." 482 Md. at 363 (citations and quotation marks omitted). The triggers are disjunctive; any one of them would suffice. All three are present.

*Consistency*

The Comptroller's reading of the production-activity exemption—generation qualifies, transmission and distribution do not—is not a litigating position devised for this appeal. It is the agency's settled construction. The Assistant Director of the Compliance Division testified that the Comptroller has applied that reading for years, not to Potomac Edison alone but uniformly across electric-utility taxpayers. The hearing officer applied it in 2012. The Tax Court confirmed it in 2015. The agency defended it through judicial review and defends it still. An interpretation the agency has held and applied consistently

17

over time is owed deference on that ground independently of any other, and this one has held without deviation from the audit through this Court.

What makes the consistency trigger more apparent in this case is that the Comptroller and the Tax Court reached the same legal conclusion by different routes. The Comptroller grounded the result in Maryland's manufacturing cases, reasoning that voltage transformation no more produces a new product than the pressure reduction this Court declined to call manufacturing in *Suburban Propane*. The Tax Court grounded the same result in the structure of the deregulation amendment, which narrowed "production activity" in § 11-101(f)(1)(ii) to "generating electricity" while expanding "taxable service" in § 11-101(m)(11) to capture the transmission and distribution of electricity. One path runs through a line of Maryland cases stretching back more than a century; the other through the text the General Assembly enacted in response to deregulation. Both reach the same conclusion as a matter of law: the tax exemption does not extend beyond generation.

The Majority engaged none of this. It did not weigh whether the denial of Potomac Edison's request for a tax exemption was the result of a consistent application of the statute and regulation because it never reached the question. Its threshold ruling—that the Comptroller forfeited deference by not requesting it—excused the Majority from the *FC-GEN* inquiry before that inquiry began. So, a construction the administering agency has held without deviation from the 2012 audit through this Court, confirmed by a neutral adjudicator and grounded independently in both the transformation cases and the deregulation amendment, received no deference at all. Not because the conditions for

18

deference were examined and found wanting, but because, on the Majority's view, the agency neglected to ask.

*Elaboration*

The Comptroller's determination was supported by an elaborate and detailed legal analysis. Where the Appellate Court in *Potomac I* reversed by consulting a dictionary and declaring the question answered, the hearing officer worked through the statute's structure and history: the segregation of "processing or refining" from "generating electricity" in both § 11-210 and COMAR 03.06.01.32-2, the parallel segregation in the predecessor statute, Article 81, § 324(s), and the absence of any legislative history[3] or revisor's note

---

[3] Especially pertinent in this case is the fact that the Comptroller's reading of the legislative rationale for the exemption was to promote the generation of electricity in Maryland, not to have it imported from out of state:

> The purpose of the expansion of the production activity exemption to generation of electricity *was to encourage electricity companies to build power generating facilities in the State of Maryland*. The operation of large power generation facilities requires numerous employees that require technical skill and thus are higher wage paying jobs. Moreover, with modern advances in technology, a power plant can be built in one state and the power distributed to residents in another state. The State of Maryland is relatively small in size and located next to several other states. *Thus, the exemption is to encourage companies to build facilities in Maryland to generate power in Maryland.*

> Conductor cables, transformers, substations, support structures, and other items are used to distribute the electricity to residential and commercial customers in Maryland. Regardless of whether the electrical generating plant is located in Maryland or a surrounding state, the items are necessary to transmit and distribute the power from the generating facility to the customer's location. The presence of the claimed items in the State is entirely dependent upon the number of residences and businesses located in the State who require electricity. *Thus, there is no benefit to the State of*

19

suggesting that the later inclusion of electricity in the definition of tangible personal property was meant to expand the exemption beyond generation. From that structural reading the hearing officer drew the conclusion: Potomac Edison's "equipment does not perform a production activity and thus, is not located a production activity site." That is interpretation of the kind *FC-GEN* rewards—reasoned, grounded in text and history, the product of an agency working through the statute it administers rather than around it.

*Adversarial Process*

The Comptroller's determination issued from a contested administrative hearing with competing evidence and argument, and the Tax Court's 2015 ruling followed contested proceedings involving expert testimony, briefing, and argument. The construction was forged in the adversarial crucible *FC-GEN* identifies, not announced in the abstract.

\*         \*         \*         \*

Each trigger is independently satisfied, and the Majority engaged none of them. It did not ask whether the agency had applied it consistently, whether the Comptroller's construction was the product of reasoned elaboration, or whether it emerged from an adversarial process. It asked only whether the Comptroller had requested deference, found that it had not, and stopped there. So, a construction the administering agency has held without deviation from the 2012 audit through this Court—confirmed by a neutral

---

*Maryland to provide tax exemption for the purchase and location of these items.* As such, the hearing officer does not believe that the Maryland legislature intended to expand the exemption to cover these pieces of equipment. (emphasis added).

20

adjudicator, grounded independently in both the manufacturing/transformation cases and the deregulation amendment—received no deference at all. Not because the conditions were examined and found incorrect, but rather because, in the Majority's view, the agency neglected to ask. *FC-GEN* directs the opposite inquiry, and on that inquiry the record runs one way.

## IV.    The Majority's Definition of "Processing" Has No Limiting Principle

When interpreting a statute, this Court does not begin with a layman's dictionary. It begins with the text, taking into account the structure of the statutory scheme as a whole. *Sabisch v. Moyer*, 466 Md. 327, 350 (2019); *see also Comptroller of Treasury v. John C. Louis Co., Inc.*, 285 Md. 527, 538 (1979) (holding that a tax statute is unambiguous "when read in context and in light of the purposes of the Act"). Where the text as understood within its proper place in the greater structure of the statutory scheme is unambiguous, the analysis ends there. Where the text remains ambiguous, however, this Court applies the canons of construction—including, most importantly here, the rule that tax exemptions are construed strictly against the taxpayer and that the burden of demonstrating entitlement to an exemption falls on the party claiming it. *Belcher*, 315 Md. at 118; *Consol. Coal Sales Co.*, 382 Md. at 455 (citation and quotation marks omitted). Only when text, statutory structure, and canon all fail to resolve a question does a court turn to general purpose dictionaries—and even then, this Court has cautioned against the "mechanical application of dictionary definitions to words in a statute." *Morris v. Prince George's County*, 319 Md. 597, 606 (1990). The dictionary is "a starting point in the work of statutory construction, but not necessarily the end." *Id.*; *see also Marriott Emps. Fed. Credit Union v. Motor*

*Vehicle Admin.*, 346 Md. 437, 447 (1997) ("[D]ictionary definitions do not provide dispositive resolutions of the meaning of statutory terms[.]" (citation omitted)).

The Majority inverts this sequence. It begins with the dictionary—pulling general purpose definitions from 1963 and 1968—and asks whether voltage stepping constitutes "processing" within the meaning of a "production activity" pursuant to Tax-General § 11-101(f)(1)(i). Maj. Slip Op. at 14–15. It does not first ask whether the structure of § 11-101(f)(1) resolves the question. And it does not ask whether the canon of strict construction supplies the answer. That is not the proper order of analysis. The General Assembly addressed electricity specifically and exclusively in subsections (f)(1)(ii) and (m)(11). In TG § 11-101(m)(11), the General Assembly unambiguously designated "a transportation service for transmission . . . of electricity" as a taxable service and therefore not as a production activity. Notably, neither the Majority nor the Respondent mention subsection (m)(11), let alone explain how it fits in their understanding of the statutory regime. And even if ambiguity remains, the canon of strict construction places the burden on Potomac Edison and resolves doubt in favor of the State. These two propositions, applied in the order the law requires, dispose of the case before the dictionary even comes into play.

Going outside the statutory scheme to consult a general purpose dictionary produces exactly the problem this case illustrates. The Majority defines "processing" as "a series of actions or operations conducing to an end" or "a systematic series of actions directed to some end." Maj. Slip Op. at 14–15 (citing WEBSTER'S SEVENTH NEW COLLEGIATE DICTIONARY 678 (1963) and THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, COLLEGE EDITION 1055 (1968)). It applies this definition to find that voltage

stepping is "a series of actions designed for the specific objective of delivering, over long distances, electricity generated out of State, to Maryland customers at a voltage suitable for their use." *Id.* Voltage stepping, therefore, is "processing," and the equipment performing it qualifies for the exemption. *Id.*

The Majority acknowledges that this definition "can encompass a broad range of activities," *id.* at 15, but concludes that breadth does not equal ambiguity. With respect, the problem with the Majority's definition is not ambiguity in the abstract. The problem is that a general dictionary definition—untethered from any statutory context—is a poor instrument for defining what "processing" means in a tax exemption statute.[4] Standard dictionary entries are inherently agnostic to context; they fail to supply the specialized meaning and boundaries that the body of statutory text, legislative history, and administrative practice has supplied for tax purposes. Because the Majority relies on a tool that lacks this context, it adopts a definition that has no stopping point. Once "processing" is defined as a "series of actions directed to some end," virtually every commercial activity ever undertaken qualifies. Consider:

- A UPS driver picks up a package from a warehouse and delivers it to a customer's home. That is a series of actions directed to an end—delivering the

---

[4] The dictionary, untethered from statutory context, produces familiar mistakes. A botanist will tell you that a tomato is a fruit. In *Nix v. Hedden*, 149 U.S. 304, 307 (1893), the U.S. Supreme Court held that under the Tariff Act of 1883, a tomato was a "vegetable" notwithstanding the dictionary definition. Dictionary definitions, the Court held, "are admitted, not as evidence, but only as aids to the memory and understanding of the court." *Id.* at 307. So too here. The dictionary definition of "processing" cannot displace the categorical line the General Assembly drew in §§ 11-101(f)(1)(ii) and (m)(11) between activities that are exempt and activities that are taxed.

package. Under the Majority's definition, the driver is "processing" the package, and the truck used to deliver it is exempt as tangible personal property used in a production activity.

- A water utility pumps water from a reservoir through pipes to customers' homes, adjusting pressure along the way. That is a series of actions directed to an end— delivering water at a usable pressure. Under the Majority's definition, the utility is "processing" water, and the pumping equipment is exempt.

- A natural gas utility moves gas through pipelines, adjusting pressure as needed for distribution. Under the Majority's definition the utility is "processing" gas, and the entire distribution network is exempt.

The Majority's reading is not just theoretically overbroad. It is overbroad on the actual record before this Court. The capital audit schedules in this case show that Potomac Edison sought to exempt, among other things, treated yellow pine wood utility poles ("POLE, SYP 50', CLASS-3" and "POLE, SYP 35', CLASS-5"), concrete manholes ("MANHOLE, CONC, 06X12X07"), and nylon self-locking cable ties ("TIE, CABLE, NYL, SELFLOC"). A statutory term that classifies utility poles, concrete manholes, and nylon cable ties as production equipment is not a term doing meaningful work. It is a term applied with no limiting principle at all.

None of this can be what the General Assembly intended when it enacted a production activity exemption to attract manufacturing industry to Maryland. Yet the Majority's definition produces all of these results, and the Majority offers no limiting

principle to exclude them. The Majority sidesteps this implication by disclaiming in footnote 7 that the Comptroller "does not explain how the meaning of 'processing' can be narrowed for the electricity industry without also narrowing it for every other industry covered by the exemption." Maj. Slip Op. at 21 n.7. But this shifts a burden meant to be borne by the taxpayer onto the Comptroller. The law charged Potomac Edison with the task of demonstrating how "processing," properly construed, reaches the activities at issue here. Potomac Edison's definition, which now has the imprimatur of this Court, fails to discharge this task.

In any case, the traditional answer—and the only answer that supplies a limiting principle—is that "processing," like its statutory neighbors "assembling," "manufacturing," and "refining," describes industrial activity that transforms tangible personal property into something materially different. The canon of *noscitur a sociis* requires no less. "[A] word is given more precise content by the neighboring words with which it is associated[.]" *Turenne v. State*, 488 Md. 239, 285 (2024). The four verbs in § 11-101(f)(1)(i) form a coherent category: they describe activities at the production end of a commercial supply chain, all of which involve a change in the form, composition, or character of the raw material. That coherence is the limiting principle the Majority's definition lacks.

Maryland law has also long supplied a complementary test for whether an activity falls within the production activity exemption: this standard asks whether the activity falls

25

within the "common understanding" of "manufacturing" or "processing."[5] *Macke Co. v. State Dep't of Assess. & Tax'n*, 264 Md. 121, 130 (1972); *State Dep't of Assess. & Tax'n v. Consumer Programs, Inc.*, 331 Md. 68, 74 (1993). In *Consumer Programs*, this Court explained that street paving was not "manufacturing" primarily "because the average person would not consider it manufacturing[.]" 331 Md. at 74. The same principle disposes of this case. "Processing" is not the word an ordinary person would use to describe the movement of electricity from a power plant to a customer's home through a network of wires and transformers. The record confirms it: both parties' experts disclaimed that "processing" is even a term of art within the electric power industry to describe what Potomac Edison does. Potomac Edison's expert, Dr. Billy Don Russell, testified that "we don't use [processing] to describe the [transmission and distribution] system in normal capacity." If the parties' experts do not call what Potomac Edison does "processing," neither should this Court—particularly when it owes deference to the Comptroller and the Tax Court, both of which read the statute the same way.

---

[5] The legislative history confirms this understanding. The 1968 committee report that recommended the production activity exemption described the proposed exemption as covering "machinery used in manufacturing, *industrial processing*, research and development and air and water pollution control." SPECIAL JOINT LEGISLATIVE COUNCIL EXEC. COMM. ON THE MD. SALES, USE, AND ADMISSIONS TAXES, REPORT OF THE SPECIAL JOINT LEGISLATIVE COUNCIL EXECUTIVE COMMITTEE ON THE MARYLAND SALES, USE, AND ADMISSIONS TAXES, AN IN-DEPTH STUDY, at 37 (Nov. 1968) (emphasis added). The same report further emphasized the industrial focus, noting that "industry would still pay a substantial tax on purchases of property other than that used in manufacturing, research and development, and *industrial processing*." *Id.* (emphasis added). The General Assembly enacted the production activity exemption against this backdrop. "Processing," as used in § 11-101(f)(1)(i), means industrial processing—not commercial movement of a finished product through a distribution network.

The Majority's reading cannot survive the common-understanding test. Nor can it survive the more specific test this Court has applied to the production activity exemption itself. In *Comptroller of Treasury v. Disclosure*, this Court held that the operative question for the production activity exemption is "whether a product has gone through a substantial transformation in form and uses from its original state." 340 Md. at 684. The Majority disclaims this test in footnote 8, reasoning that *Disclosure*'s substantial transformation test applies only to "manufacturing" and not to "processing." Maj. Slip Op. at 21 n.8. But *Disclosure* characterized the entire production activity exemption—not just the manufacturing clause—as "a tax exemption for manufacturing activities." 340 Md. at 683. The transformation requirement was not limited to one verb; it described the overall character of the statutory scheme. The Majority's reading of *Disclosure* elides that pivotal characterization.

Once the substantial transformation requirement is reinstated to its proper place, the analysis becomes straightforward. Generation of electricity satisfies the test easily. Both parties' experts agreed that, at a power plant, raw materials—coal, natural gas, water, nuclear fuel—are converted into electric power through a process of energy conversion. The raw material goes in; an entirely different product comes out. That is transformation in the most literal sense, and it explains why the General Assembly's specific exemption for "generating electricity" in § 11-101(f)(1)(ii) makes perfect sense: generation qualifies because it transforms something into something else.

Transmission and distribution are different in kind. Consider an analogy that has long operated as a matter of common knowledge. Con Edison has operated a district steam

system in Manhattan since 1882, heating thousands of buildings by generating steam at central plants and distributing it through underground pipes to customers. New York exempts the generation of steam under its production activity exemption. N.Y. Tax Law § 1115(a)(12). But New York's tax authority draws the line at distribution: equipment used in the "distribution phase" does not qualify. *See* N.Y. Dep't of Taxation & Finance, Tax Bulletin ST-121. The reason is intuitive. Generation transforms water into steam—raw material in, different product out. Distribution simply moves the steam through pipes to the customer. The product is the same at both ends. No one would call distribution a production activity, whatever the temperature or pressure of the steam being moved.

Potomac Edison's operations are no different in principle. Voltage is stepped up at the point of transmission—like converting water to steam—to move electricity efficiently over long distances, then stepped down at the point of delivery—like condensing steam back to water—for the customer's use. The electricity is the same product at both ends. And, as the record makes plain, Potomac Edison's own expert, Dr. Ewald Fuchs, admitted that voltage stepping is not even necessary to make electricity usable; it is necessary only for efficient long-distance transmission. When asked whether a step-down transformer at the generating plant could reduce voltage to 120 volts before the electricity entered the T&D System, making it immediately usable without further voltage manipulation, Dr. Fuchs said yes—electricity could be delivered 500 meters away at that voltage. "[E]xactly what Edison did in New York[,]" he said. He then conceded explicitly that the voltage changes occurring during long-distance transmission "are not necessary to produce usable energy."

This is the same Edison who, in 1882, simultaneously built New York's first electrical distribution system—sending electricity through wires from Pearl Street Station to nearby customers—and a cogeneration plant at that same station that supplied steam heating to neighboring buildings through underground pipes, the direct predecessor of Con Edison's modern steam system. Neither system substantially transformed its product. Both moved it. Neither was a production activity. Both were delivery. The same is true of Potomac Edison's T&D System today.

The Comptroller's expert confirms what Potomac Edison's own expert admitted. Dr. Saifur Rahman testified that a transformer "receives a given amount of power, it all has defined quality, streaming electron, that's what it gets. And it delivers on the secondary side same amount of power at a different voltage and different current." As Dr. Rahman explained: "Electrons have . . . fixed property. That did not change. Because if it came out unchanged in terms of [its] property[,] my answer is nothing has been processed." *Id.* The molecular and physical properties of the electricity are unchanged through the T&D System. And, more remarkably, Potomac Edison's own lead expert agreed. Dr. Russell testified, in candor: "My friend Dr. Rahman . . . and I . . . on the matters of electrical science, we're in total agreement . . . I don't have any disagreement at all with the electrical science that he has put forward." Dr. Russell maintained Potomac Edison's position only by "translat[ing] electrical science into . . . the opinion language"—that is, by reading the term "processing" through the lens of *Potomac Edison I*'s judicial gloss rather than through the science of what the equipment actually does. When the parties' experts agree on the

science and disagree only on whether the law requires bending that science to fit a prior judicial opinion, the better reading is the one that does not require bending it.

The transport-and-logistics framing supplied by the Comptroller's expert further confirms the point. Dr. Rahman described the T&D System using the language of road infrastructure: "We have roads, streets in neighborhoods, we have intersections, traffic light . . . If traffic light fails the cars all of them don't stop. They go. They go slowly." That is the right mental picture. The T&D System is a delivery infrastructure. The "machine" theory advanced by Potomac Edison—that the entire grid is a single integrated processing machine—is at odds with how the equipment actually functions. It is shipping, not manufacturing.

## V.    The Majority's Reading of *Suburban Propane* Treats Dicta as Holding

To sustain its reading of "processing," the Majority places significant weight on this Court's 1954 decision in *Suburban Propane*. The Majority reads *Suburban Propane* to support the proposition that "manufacturing" and "processing" are distinct activities, and that "processing" may reach activities like voltage transformation that fall short of manufacturing. Maj. Slip Op. at 18–20. The Majority draws this conclusion principally from this Court's passing reference in *Suburban Propane* to the Alabama Supreme Court's decision in *State v. Alabama Gas Corp.*, 62 So.2d 454 (Ala. 1952), which held that gas regulators "process" gas. Maj. Slip Op. at 19-20. With respect, this reading transforms dicta into holding—and selects a foreign court's reasoning over the actual reasoning of the Maryland decision it inhabits.

30

The actual holding of *Suburban Propane* is quite different than what the Majority would have us believe. In that case, the taxpayer was a propane distributor who argued that its activities—storing liquid propane, adding chemicals for safety and transportation, delivering it to customers in tanks, and using valves and regulators to convert it from liquid to gaseous form for use—constituted manufacturing or compounding within the meaning of Article 81, § 370(f) of the 1951 Code. *Suburban Propane,* 205 Md. at 85–87. This Court rejected the claim. *Id.* at 93–94. Adding odorant and antifreeze to liquid propane was not compounding because it did not change the propane's BTU content. *Id.* at 86–89. Reducing the pressure on liquid propane to convert it into a gaseous form was not manufacturing. *Id. Suburban Propane* was about the manufacturing and compounding exemptions. *Id.* It said nothing about the term "processing" and its relationship to the manufacturing exemption.

Yet, the Majority extracts a different meaning by focusing on the Court's two-sentence reference to *Alabama Gas Corp.* The Majority reads this Court's observation that the Alabama court had distinguished manufacturing from processing—and had held that gas regulators "process" gas—as a Maryland recognition of that distinction with binding implications for the present case. More specifically, the Majority construes the *Suburban Propane*'s threadbare reference to *Alabama Gas Corp.* as an "acknowledge[ment] that 'manufacturing' gas . . . and 'processing' gas . . . were two different activities" and as "reflect[ing] this Court's awareness that this distinction was based on a similar distinction drawn by the Supreme Court of Alabama between generating electricity and the 'stepping down' process necessary to bring electricity in a useable form to consumers." Maj. Slip. Op. at 19-20. But *Suburban Propane* did not adopt the Alabama framework as Maryland

31

law. And, it was not about electricity at all. In fact, the Court only mentioned *Alabama Gas Corp.* in order to distinguish it from the facts of *Suburban Propane*—*Alabama Gas Corp.* applied the "manufacturing" and "processing" exemptions to the gas industry while *Suburban Propane* interpreted the terms "compounding" and "manufacturing" for purposes of propane gas production. *Suburban Propane*, 205 Md. at 89-90. It noted the Alabama court's reasoning while resolving a totally different question on different grounds. As this Court itself made clear in *Suburban Propane*, the taxpayer in *Alabama Gas Corp.* proceeded solely under the theory that its equipment was used in processing, and made "[n]o contention . . . that such regulators were used in compounding or manufacturing." 205 Md. at 89–90 (citation omitted). The *Alabama Gas Corp.* reference was illustrative, not adoptive.

What is more, the Majority misses another case discussed in the same paragraph as the *Alabama Gas Corp.* reference, one whose holding undercuts their reading of *Suburban Propane*. Along with *Alabama Gas Corp.*, the *Suburban Propane* court also cites *Peoples' Gas & Electric Co. v. State Tax Commission*, an Iowa Supreme Court case deciding whether a utility company's electric distribution system, the very equipment at issue in the instant case, fell within the processing exception to Iowa's use tax. *Suburban Propane*, 205 Md. at 90-91 (citing 238 Iowa 1369, 1386-87 (1947)). In *Peoples' Gas & Electric Co.*, the Iowa Supreme Court held that "the poles, wires, transformers and other equipment in the distribution system were not directly used in . . . servicing the electric energy within the meaning of the processing exception" and denied the utility company's exemption claim. 238 Iowa at 1386. *Suburban Propane* explicitly quotes this case. *Suburban*

*Propane*, 205 Md. at 90-91 (quoting *Peoples' Gas & Elec. Co.*, 238 Iowa at 1386-87). If indeed this Court's passing reference to *Alabama Gas Corp.* in *Suburban Propane* "reflects this Court's awareness" that the distinction between the "manufacturing" and "processing" in Maryland tracks the one adopted by the Supreme Court of Alabama, Maj. Slip Op. at 20, this Court would have reconciled it with the Iowa Supreme Court decision, a decision that, at the very least, casts doubt on the Majority's reading of *Suburban Propane.* This omission is a critical clue. This Court never took up this reconciliation project, because *Suburban Propane* was not concerned with the distinction between "manufacturing" and "processing" in any manner relevant to the issues presented in this case. Its sole focus was on applying the terms "manufacturing" and "compounding" to propane gas production.

Despite the Majority's best attempt to portray its decision as continuous with this Court's prior holdings, the issue presented here is a novel one. This Court has never held that transformers "process" electricity. It has never held that gas regulators "process" gas. It has never resolved whether the kind of pressure-or-voltage manipulation involved in distribution constitutes processing under Maryland law. The correct approach is to take *Suburban Propane* for what it held: pressure reduction in gas distribution is not manufacturing or compounding. Nothing more. Nothing less.

VI.     **The Majority's Reading Renders Subsection (f)(1)(ii) Surplusage and Cannot Be Reconciled with the Statutory Scheme**

The Majority's reading of "processing" also produces an irreconcilable conflict within Tax-General § 11-101(f)(1) itself.

The General Assembly addressed electricity in this statute deliberately, specifically, and in its own subsection: § 11-101(f)(1)(ii) defines the production activity exemption for the electricity industry as "generating electricity for sale or for use in another production activity." Potomac Edison concedes it does not generate electricity in Maryland. It therefore does not qualify under subsection (ii). The question becomes whether the General Assembly—having already addressed electricity with surgical precision in subsection (ii)—silently extended a second, broader exemption to the transportation of electricity by burying it within the word "processing" in subsection (i). Under the canon that "ordinarily the specific prevails over the general," *Murphy v. Liberty Mut. Ins. Co.*, 478 Md. 333, 383 (2022), subsection (ii) is the specific provision governing electricity, and it controls over the general "processing" language in subsection (i). The Majority's reading inverts this canon: it allows the general to swallow the specific entirely.

Worse, if electricity were already covered under subsection (i) as tangible personal property that can be "processed," then generating electricity—which is plainly a more transformative activity than voltage stepping—would already qualify as a production activity under (i), making (ii) entirely redundant. The legislature does not draft redundant provisions. The presumption is that each subsection serves a distinct purpose. *See Newell v. Runnels*, 407 Md. 578, 642 (2009) ("[C]ourts loathe interpreting a statute in a manner that renders any of its language surplusage[.]"). The only reading that gives both subsections independent effect is that (i) does not apply to electricity, and (ii) brings only the specific activity of generating electricity within the exemption's reach. Any other

reading reduces subsection (ii) to surplusage—a result this Court has consistently refused to countenance. *Doe v. Catholic Relief Servs.*, 484 Md. 640, 652 (2023).

The legislative history confirms this structure. Before 1968, neither the generation nor the processing of electricity qualified for any tax exemption as a production activity. This Court held in *Frederick Electric Light & Power Co. v. Frederick City*, 84 Md. 599 (1897), that electricity generation does not constitute "manufacturing" for purposes of a tax exemption. No Maryland court has ever held that processing electricity qualifies for any tax exemption either. Both activities were outside the exemption before 1968. The 1968 enactment changed the legal status of one of these activities and only one: it added "generating electricity" as a separate, specifically enumerated production activity. TG § 11-101(f)(1)(ii). The General Assembly said nothing about processing electricity. Nothing.

The Majority reads the 1968 enactment as a broad legislative move that abrogated *Frederick Electric Light* and thereby brought electricity-related activities within the scope of the production activity exemption—including, in the Majority's view, "processing." Maj. Slip Op. at 18. That reading misunderstands what legislative abrogation can do. The General Assembly may abrogate a judicial holding. It cannot abrogate a judicial holding the court never made. *Frederick Electric Light* held that the generation of electricity does not constitute "manufacturing." 84 Md. at 603. That holding addressed generation. It did not address processing because that issue was not before the Court.

The 1968 enactment did exactly what a targeted legislative response can do: it displaced the specific judicial holding the General Assembly chose to address. The General Assembly added "generating electricity" to the list of production activities and thereby

35

abrogated *Frederick Electric Light*'s holding as to generation. Tax-Gen. § 11-101(f)(1)(ii). The General Assembly did not and could not abrogate a *Frederick Electric Light* holding on processing, because no such holding exists. The 1968 enactment changed the legal status of generation. It did not change the legal status of processing. The Majority's contrary reading attributes to the General Assembly an abrogation it had no occasion to perform. The Majority has, in effect, judicially created a tax exemption the General Assembly never actually enacted.

Potomac Edison's own attempt to harmonize subsections (i) and (ii) only deepens the problem. Potomac Edison argues that subsections (i) and (ii) are coextensive rather than operating on different planes, because clause (ii) covers "generating electricity" "for sale or for use in another production activity," while clause (i) covers "manufacturing" or "processing" electricity "for resale." That argument generates more puzzles than it solves. Why would the General Assembly use the term "manufacturing" in clause (i) to describe the production of electricity intended "for resale," but then switch to the more precise term of art "generating" in clause (ii) when describing the production of electricity intended "for sale or for use in another production activity"? And if the General Assembly intended to provide a production activity exemption for the "processing" of electricity under clause (i), why would it exclude the "processing" of electricity "for sale or use in another production activity" from the exemption? No coherent reading of the statute answers these questions. The only coherent reading is the one I urge: clause (i) does not apply to electricity at all.

The Majority's reading produces a further anomaly, and this one goes to the coherence of the statutory scheme. Section 11-101(m)(11) classifies "a transportation

36

service for transmission, distribution, or delivery of electricity" as a taxable service. Yet the Majority's reading would have the General Assembly classify transmission and distribution as a taxable service in one provision while exempting the equipment used to perform that activity in another—two incompatible commands in a single scheme, with nothing in the text to reconcile them. Potomac Edison has never explained how both can be true. A statute that taxes an activity and exempts the means of performing it needs some textual or structural basis for the distinction, and none appears here.

The difficulty traces to the provision the Majority's analysis leaves aside. The opinion cites § 11-101(k)(2)(iii), which defines electricity as tangible personal property, but does not reach § 11-101(m)(11), the provision classifying its transmission and distribution as a taxable service. The Appellate Court in *Potomac Edison I* at least acknowledged that (m)(11) existed, acknowledged the Tax Court's reliance on it, and explained why it read the statute differently. *Potomac Edison I*, 2019 WL 1897463 at *5, 9. Confronting the provision and disagreeing with the Tax Court's reading of it is a contestable choice. The Majority's reading does not reach that question, and so the tension between taxing the activity and exempting the equipment goes unaddressed.

Potomac Edison advances a more basic argument that warrants direct response: that even though transmission and distribution of electricity is classified as a taxable service under § 11-101(m)(11), the equipment used to perform that taxable service may nonetheless be exempt as production equipment under § 11-210(b)(1). The argument is untenable. A tax statute does not work by accident. When the General Assembly classifies the transmission, distribution, and delivery of electricity as a taxable service, it is making

a policy choice about how those activities are treated under the sales and use tax regime. The equipment used to perform a taxable service is, by definition, equipment used to perform a non-production activity. The two designations cannot coexist for the same activity in the same statute. To accept Potomac Edison's argument is to accept that the General Assembly enacted contradictory provisions in the same statutory scheme—taxing an activity in one breath and exempting the equipment used to perform it in the next. The General Assembly does not work that way. The provisions read together produce a single coherent rule: transmission and distribution of electricity is a taxable service, and the equipment used to perform that service is not exempt as used in a production activity.

The comparison with other states underscores the point. When legislators want to exempt the transmission and distribution of electricity, they say so. California does— expressly granting an exemption for "electric power generation, storage, or distribution." Maryland did not. New York went further: in 2019, it made the transmission and distribution of electricity explicitly taxable under a comparable statutory scheme. *See* 2019 N.Y. Laws ch. 59, part V. Maryland's General Assembly used the words "transmission" and "distribution" too—in § 11-101(m)(11), where it classified those very activities as taxable services. Maryland is not silent on transmission and distribution. It addressed those activities directly and deliberately—not to exempt them, but to tax them.

## VII.   The Majority's Treatment of the "Maintaining" Exclusion Begs the Question

Even setting aside everything I have said about the Majority's reading of "processing," there is an additional and independent ground for denying the exemption: Tax-General § 11-101(f)(2)(ii) expressly excludes "maintaining tangible personal property" from the definition of "production activity."   The ordinary meaning of "maintain" is to preserve or keep in existence—to prevent something from declining or being lost. That is precisely what Potomac Edison's T&D System does. The system preserves the amount of electricity against line loss as it travels from the generating plant to the customer. The record confirms it: Potomac Edison's own evidence shows that voltage is stepped up specifically to reduce line loss during transmission, and that without this preservation effort, a substantial portion of the electricity would be lost as heat before reaching the customer.   Preserving a product against loss as it travels is maintenance, expressly excluded from the exemption.

The Majority rejects this argument on the ground that "[a]n activity that transforms the product does not become maintenance merely because the transformation preserves, to the extent possible, the amount of product." Maj. Slip Op. at 22. But that response assumes the very point in dispute. The question whether voltage stepping "transforms" the product is the central question in the case. If voltage stepping transforms the electricity, the maintenance argument fails. If it does not transform the electricity—as Dr. Fuchs admitted, and as the Comptroller's expert Dr. Rahman testified, the electricity that enters the T&D System exits the T&D System unchanged in its intrinsic properties—then preserving the

39

electricity against line loss is precisely maintenance, expressly excluded from the exemption.

The Majority cannot defeat the maintenance argument by assuming the transformation that the maintenance argument denies. At minimum, where an activity falls within both a possible exemption and an express exclusion, we resolve the ambiguity in favor of the State. *See Broadway Servs., Inc.*, 478 Md. at 215 ("When determining if tax exemptions apply, we do not presume that the State surrendered its taxing power. Therefore, we strictly construe tax exemptions against the taxpayer." (internal citations omitted)). Here the tension is resolved the other way—in favor of the taxpayer claiming the exemption rather than the State, which strict construction does not permit.

## VIII. The Majority's Decision Cannot Be Reconciled with the Rule of Strict Construction

This Court has reiterated that tax exemptions are construed strictly against the taxpayer; that the burden falls on the taxpayer to demonstrate that an exemption was "clearly allowed by law"; and that "to doubt an exemption is to deny it." *Belcher*, 315 Md. at 118 (citation and quotation marks omitted); *Consol. Coal Sales Co.*, 382 Md. at 455 (citation and quotation marks omitted); *see also Broadway Servs., Inc.*, 478 Md. at 215 (citations omitted) (same). The Majority acknowledges these rules. Maj. Slip Op. at 13. But it does not apply them.

Applied here, these rules point the other way. The statutory text is at best ambiguous as applied to transmission and distribution. Subsection (f)(1)(ii) addresses electricity specifically and limits the exemption to generation; subsection (m)(11) classifies

transmission and distribution as a taxable service. Three independent decision-makers—the Comptroller's hearing officer in 2012, the Tax Court in 2015, and the circuit court on judicial review—read the statute the same way. The parties' experts agreed on the underlying electrical science, with Potomac Edison's own expert conceding that voltage stepping is not necessary to produce usable electricity and that his disagreement with the Comptroller's expert was confined to "translat[ing] the electrical science into . . . the language of the opinion.". At a minimum, this record leaves doubt about whether the exemption applies. *Consolidated Coal* supplies the consequence: "to doubt an exemption is to deny it[.]" 382 Md. at 455 (citation and quotation marks omitted). That consequence points to denial here.

Strict construction requires more. The taxpayer must show that the exemption was "clearly allowed by law," and that the "deliberate purpose of the Legislature to grant an exemption is expressed in clear and unequivocal terms." *Belcher*, 315 Md. at 118. Potomac Edison cannot make that showing. The General Assembly did not grant this exemption to the transmission and distribution of electricity in clear and unequivocal terms. It granted the exemption to the generation of electricity in clear and unequivocal terms. To reach transmission and distribution, the exemption must be extended beyond those terms by construction—which strict construction does not allow.

## Conclusion

Potomac Edison is not entitled to a tax exemption for transmitting and distributing electricity to Maryland. Section 11-101(m)(11) states this as plainly as the General Assembly can make it: the transmission and distribution of electricity is a taxable service.

The Comptroller and the Tax Court have read it that way for decades. A tax statute cannot simultaneously tax an activity and exempt the equipment used to perform it. The Majority does not engage this reality. Instead, it takes great care to unwind, one by one, a tangle of legal and factual questions that exists only because of an error this Court should have addressed at its source: *Potomac Edison I* was wrong as a matter of statutory interpretation, and the Majority now defends it with a sequence of doctrinal moves—some novel, some strained, all in service of a result the statute cannot support.

What the Comptroller and the Tax Court identified, and what *Potomac Edison I* and the Majority have lost sight of, is that the General Assembly enacted a coherent tax scheme for the electricity industry. Companies that generate electricity in Maryland receive a production activity exemption under § 11-101(f)(1)(ii). Companies that transmit, distribute, or deliver electricity do not—and § 11-101(m)(11) explicitly classifies those very activities as taxable services. Generation is exempt; transmission and distribution are taxed. The two provisions work in tandem. They reflect a single, logical legislative judgment: production deserves an incentive because it transforms raw material into a marketable product, whereas delivery does not, because moving a finished product from producer to consumer is not production. The Comptroller has applied that scheme consistently. The Tax Court ratified it in 2015. The circuit court affirmed it on judicial review. This scheme is not just defensible; it is the only reading of the statute that gives both provisions independent effect, respects the canon of strict construction, and aligns with the legislative history. The Majority's reading dismantles it entirely.

The simplest answer is the best one. This Court should overrule *Potomac Edison I*, deny the tax exemption in full, and hold that the taxpayer failed to meet its burden of proving entitlement to an exemption. The intermediate appellate court erred in two related respects: it set aside the rule of strict construction to infer an exemption the statute does not grant, and it withheld the deference owed to the specialized determinations of the Comptroller and the Tax Court.

This Court has now compounded those errors rather than correcting them. It has adopted a definition of "processing" with no limiting principle. It has read *Disclosure* narrowly to avoid that decision's substantial-transformation test. It has treated a passing reference to an Alabama case as the holding of Maryland law, without engaging what *Suburban Propane* actually held or the contrary Iowa decision cited in the very same paragraph on materially identical facts. Subsection (f)(1)(ii) is left as surplusage. Substantial-evidence review is applied to the Tax Court's 2022 findings but withheld from its 2015 findings. And a novel rule emerges along the way—that an agency forfeits deference unless it expressly requests it. None of this is reconciled with the strict-construction canon or the deference principles that should have governed from the start.

The lower courts have been telling us this for years. On remand, the Tax Court described its own difficulty with the framework *Potomac Edison I* imposed: "[There is] really no processing after it leaves the power station, but that seems to be in direct conflict with the language which I'm required to follow in the [Appellate Court's] opinion. . . . I am complexed, frankly, on how I can just pick out certain items or personal property when it sounds to me like both expert witnesses have determined that it's . . . an all or nothing

choice . . . [This is] the quandary the Court is in as a result of this opinion." The circuit court, at the conclusion of judicial review, asked the General Assembly to step in: "I would suggest the legislature deal with this issue because . . . it seems like it's much more complex than the law provides." Two courts, working in good faith within the framework *Potomac Edison I* imposed, have said the framework does not work. It was a plea for help. We should have heard them.

I respectfully dissent.